Argued and submitted October 4, affirmed on appeal and cross-appeal
December 13, 1995

Robert F. ANDERSON,
*Respondent - Cross-Appellant,*

*v.*

Anthony F. DIVITO,
*Appellant - Cross-Respondent.*

(9203-01908; CA A82253)

908 P2d 315

Barbee B. Lyon argued the cause for appellant - cross-respondent. With him on the opening brief were William F. Martson, Jr., Scott G. Seidman, and Tonkon, Torp, Galen, Marmaduke & Booth. With him on the reply brief and response on cross-appeal were William F. Martson, Jr., and Tonkon, Torp, Galen, Marmaduke & Booth.

Jacob Tanzer argued the cause for respondent - cross-appellant. With him on the brief was John M. Berman.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

LEESON, J.

## LEESON, J.

Plaintiff brought an action for declaratory judgment to interpret the terms of a contract. The trial court entered judgment for plaintiff, after ruling that one of defendant's options to purchase plaintiff's interest in real property had expired. Defendant submits nine assignments of error related to that ruling. Plaintiff cross-appeals the trial court's denial of his request for prejudgment interest. We affirm on the appeal and the cross-appeal.

Plaintiff and defendant went into business together in 1983 as equal owners of the corporate stock in an automobile dealership in Gresham. They participated equally in the management of the dealership and later jointly purchased the real property on which it is located. In 1986, they purchased a dealership in Vancouver, Washington, which they operated as a wholly-owned subsidiary of the Gresham dealership. Thereafter, plaintiff managed the Vancouver dealership and defendant managed the Gresham dealership. After the Gresham dealership's poor economic performance in 1989, plaintiff became disenchanted with defendant's management ability and demanded that the parties sever their business relationship. Lengthy and occasionally acrimonious negotiations eventually resulted in a "Separation Agreement" that was signed on October 16, 1990.

Under that agreement, the two dealerships were considered to be operating as independent entities as of August 1, 1990, with plaintiff receiving the Vancouver dealership and defendant receiving the Gresham dealership. To effect a fair division of assets, however, the value of each business was to be appraised as of July 31, 1990, and an equalization payment of one-half of the difference was to be made by plaintiff to defendant when the capital stock was exchanged. The agreement provided that each party would appoint a business appraiser who in turn would appoint a third appraiser if the two could not agree on the value of both businesses. The agreement also required the parties to cooperate to restructure the corporate entities and delayed closing of the transaction so that a tax-free exchange of capital stock could be accomplished:

"Section 6. *Closing*. The *Closing of the exchange* [of capital stock] described in Section 5 of this Agreement shall

take place * * * at 10:00 a.m., *on May 1, 1991, or such later date as the parties mutually agree, but in no event later than July 1, 1991.*" (Emphasis supplied.)

The separation agreement contained a similar appraisal procedure for determining the fair rental value of the Gresham real property, so that defendant could compensate plaintiff for its use. Additionally, the agreement gave defendant the right to purchase plaintiff's interest in the Gresham real property by granting defendant two options:

"Section 11. *Purchase Option on Gresham Real Property.*

"11.1 *Initial Option by [Defendant]. Prior to Closing as specified in Section 6, [Defendant] will have the option to purchase the equity of [Plaintiff] in the Gresham Real Property* ('[Plaintiff]'s Equity'). [Plaintiff]'s Equity will be *equal to one-half (¹/₂) of the fair market value* of the Gresham Real Property, as determined pursuant to Section 9 [establishing procedures to determine the fair rental value and the fair market value *at July 31, 1990*], less one-half (¹/₂) of the unpaid balance owed [on the financing and other mutual debt] * * * If [Defendant] exercises his option to purchase [Plaintiff]'s Equity, the purchase price must be paid in cash at a closing to be held no later than sixty (60) days after written notice of the election has been delivered to [Plaintiff] by [Defendant].

"* * * * *

"11.2 *Subsequent Option by [Defendant]. In the event [Defendant] fails to exercise the option set forth in Section 11.1, [Defendant] shall thereafter have the option to purchase from [Plaintiff] the [Plaintiff's] Equity at its then fair market value* until such time as the lease described in Section 9.1 terminates; provided, however, that the lease at the time of exercise of the option is not in default by the lessee. The exercise of the option shall be made by [Defendant] giving [Plaintiff] written notice of such exercise at least thirty (30) days prior to the effective date of purchase. Upon exercise of the option to purchase, the fair market value shall be established by mutual agreement of [Defendant] and [Plaintiff]. If they are unable to agree on a purchase price by the effective date of purchase, then the fair market value of [Plaintiff]'s Equity shall be determined by binding arbitration pursuant to the procedure set forth in Section 9 of this Agreement. Once the purchase price is determined, a closing of the sale will take place in escrow [in Portland, Oregon]. Payment of the purchase price will be in cash at the time of closing which

will be within sixty (60) days following the determination of the fair market value." (Emphasis supplied.)

Despite clear time lines that had been established for determining the July 31, 1990, values of the real property and the businesses, the appraisals were not completed until April 10, 1991, and July 26, 1991, respectively. Disputes between the parties further delayed closing of the business exchange, which did not occur until October 2, 1991.

The day before that closing, defendant attempted to exercise the Gresham real property purchase option described in section 11.1 of the separation agreement. According to defendant, that option — to purchase the property at the July 31, 1990 fair market value — did not expire until the *actual* closing of the business exchange, even though that closing had been delayed three months past the July 1, 1991, deadline. Plaintiff opposed defendant's exercise of that option, contending that the section 11.1 option had expired on July 1, 1991, and that the section 11.2 option required a new appraisal to establish a revised fair market value. Despite their disagreement on this point, the parties closed the business exchange and agreed to close the real property transaction via a separate "Closing Agreement," executed on November 27, 1991. Under that agreement, plaintiff conveyed his interest in the Gresham real property to defendant on November 27, 1991, at the July 31, 1990 (section 11.1) fair market value, and the parties agreed to litigate the disputed option provisions to determine whether plaintiff was entitled to any additional payment. Plaintiff then brought this declaratory judgment action.

After a trial to the court, it held that the section 11.1 option had expired on July 1, 1991, and ordered a new appraisal pursuant to section 11.2 of the separation agreement. The new appraisal was received on August 10, 1993. Final judgment was entered on November 12, 1993, requiring defendant to pay plaintiff an additional $125,000, which, under section 11.2, had been due by October 9, 1993, 60 days after the appraisal. The trial court also ordered defendant to pay interest on that sum from October 9, 1993.

■■ Defendant's overarching argument is that the court erred in concluding that the option under section 11.1 expired

on July 1, 1991. We apply the standard rules of contract construction to determine whether the option to purchase the Gresham real property expired on July 1, 1991 or whether defendant's right to exercise that option extended until the actual closing of the business exchange.

Defendant asserts that the trial court "erred in holding that the Separation Agreement was ambiguous" and "erred in resorting to parol evidence when there was no ambiguity in the Separation Agreement." According to defendant, the separation agreement was clear that the timing of the real property option was tied to the business closing and, therefore, the trial court should not have admitted extrinsic evidence of the parties' negotiations. He argues that the trial court compounded those errors by resorting to parol evidence to "write into the Separation Agreement a provision that the option expired absolutely on July 1, even if closing was extended beyond July 1." Plaintiff responds that the trial court properly considered evidence of the circumstances at the time of execution of the separation agreement in determining whether the contract was ambiguous, but that the trial court did not rely on parol evidence to determine the parties' intent, because there was no evidence that before execution of the separation agreement either party had contemplated that closing of the business exchange would occur after July 1, 1991. According to plaintiff, the trial court did not add a term to the contract; it merely interpreted the words used by the parties in accordance with the general intent of the agreement as a whole.[1] Alternatively, plaintiff, like defendant, contends that the agreement is unambiguous, but reads section 6 differently than does defendant.

In general, the construction of a contract is a question of law for the court. *Timberline Equipment v. St. Paul Fire & Mar. Ins.*, 281 Or 639, 643, 576 P2d 1244 (1978). If contract language is ambiguous, extrinsic evidence of the parties' intent may be admitted, and interpretation of that

---

[1] The parties agree that the separation agreement is an integrated contract. Section 14.2 of that agreement provides:

"This Agreement, together with any attached exhibits, constitute the entire understanding between the parties with respect to the subject matter of this Agreement and supersedes any and all prior agreements or understandings between the parties with respect to the same subjects. This Agreement may be amended only by a writing signed by the parties."

language becomes a question of fact. *Adams v. Knoth*, 102 Or App 238, 243, 794 P2d 796, *rev den* 310 Or 422 (1990); *see also* ORS 41.740 (codifying parol evidence rule). The initial question of whether a contract is ambiguous is a question of law. *Abercrombie v. Hayden Corp.*, 320 Or 279, 292, 883 P2d 845 (1994). In determining whether an ambiguity exists, the court may consider parol and other extrinsic evidence. *Id.* (citing ORS 42.220[2]); *see also Criterion Interests, Inc. v. The Deschutes Club*, 136 Or App 239, 243, 902 P2d 110, *on recon* 137 Or App 312, 903 P2d 421 (1995) (concluding that *Abercrombie* resolved the historical uncertainty as to whether the type of evidence described in ORS 42.220 should be admitted to aid the court in determining if an ambiguity exists). Although ORS 42.240[3] requires us to pursue the intention of the parties, if possible, ORS 42.230[4] requires construction of the contract as a whole, giving effect to every word and phrase. *Slocum v. Lang*, 132 Or App 571, 576, 889 P2d 379 (1995); *see also Criterion Interests, Inc.*, 136 Or App at 244 (ORS 42.230 limits other rules of construction). For a term to be legally ambiguous, it must be susceptible to at least two plausible interpretations when examined in the context of the contract as a whole. *Slocum*, 123 Or App at 576.

The separation agreement states that the section 11.1 option must be exercised "[p]rior to closing as specified in Section 6." Section 6 specifies that the closing of the capital stock exchange "shall take place * * * on May 1, 1991, or such later date as the parties mutually agree, *but in no event later*

---

[2] ORS 42.220 provides:

"In construing an instrument, *the circumstances under which it was made, including the situation of the subject and of the parties, may be shown* so that the judge is placed in the position of those whose language the judge is interpreting." (Emphasis supplied.)

[3] ORS 42.240 provides:

"In the construction of an instrument, the intention of the parties is to be pursued if possible; and when a general and particular provision are inconsistent, the latter is paramount to the former. So a particular intent shall control a general one that is inconsistent with it."

[4] ORS 42.230 provides:

"In the construction of an instrument, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all."

*than July 1, 1991."* (Emphasis supplied.) Read together, those provisions unambiguously state that defendant is entitled to exercise the section 11.1 Gresham property purchase option anytime before the closing of the business exchange, so long as that exchange occurs before July 1, 1991. However, because the business exchange did not take place by July 1, 1991, it is necessary to examine the circumstances at the time the separation agreement was executed to determine whether section 6 contains a latent ambiguity. ORS 42.220; *Rodway v. Arrow Light Truck Parts,* 96 Or App 232, 236, 772 P2d 1349 (1989).

Testimony at trial demonstrates that the wording of sections 11.1 and 6 reflected a compromise between the parties. Initially, defendant wanted the section 11.1 property purchase option price to be available for one year, while plaintiff wanted to limit defendant's exercise of that option to two months beyond completion of the real estate appraisal, which was expected to be about March 1, 1991. Defendant subsequently proposed a six-month option period, then offered to compromise at four months. Plaintiff rejected defendant's proposals until the language of section 6 was offered. It allows the property option cutoff date to "float" with the business closing between the limits of May 1 and July 1. That language reflects defendant's desire for a four-month option period, as well as plaintiff's preference for a two-month option period. The significant point is that nothing in the record renders ambiguous the parties' written agreement that defendant exercise the section 11.1 property purchase option before July 1, 1991. Defendant's interpretation would require us to disregard the phrase "but in no event later than July 1, 1991," which we are forbidden to do. ORS 42.230. We thus conclude that the separation agreement is unambiguous, and that defendant's option to purchase the Gresham real property expired on July 1, 1991.

■ We next address defendant's argument that the trial court erred in concluding that the section 11.1 option provision was "severable" from the remainder of the contract and that it was therefore error to give two different interpretations to the identical phrase, "Closing as specified in section 6," in section 1.2(e) and section 11.1 of the contract. Defendant argues that the trial court properly interpreted section

1.2(e) — which states that the transfer of capital stock shall occur at "Closing, as specified in Section 6" — to allow the exchange of stock on October 2, but erred in interpreting that same phrase to require exercise of the section 11.1 property purchase option by July 1. Whether or not the trial court gave such discrepant interpretations is not relevant here, because the meaning of "closing" in section 1.2(e) is not before us. We need not determine the effect on section 1.2(e) of the failure to close the business exchange by July 1, 1991, as contemplated by section 6, had either party subsequently refused to perform, because it is undisputed that after July 1 the parties chose to proceed as if they still had an obligation to close the business exchange and to be bound by the separation agreement, despite failure of the condition that closing would occur no later than July 1, 1991. The relevant inquiry concerns the effect of modification or waiver of the closing requirement in section 6, if any, on the section 11.1 property purchase option.

Therefore, we next consider defendant's argument that the parties modified or waived, by their behavior or by oral agreement between their attorneys, the provision of the agreement that required closing of the business exchange by July 1, 1991, and thereby extended the deadline for exercising the section 11.1 option. Defendant's argument suggests that the phrase "in no event later than July 1, 1991," was entirely eliminated from the separation agreement by modification or waiver. According to plaintiff, any agreement to extend the closing of the business exchange did not extend the deadline for exercising the section 11.1 property purchase option. Plaintiff argues that, because the trial court found that the section 11.1 option had expired on July 1, 1991, defendant was required, but failed, to affirmatively show that plaintiff had either agreed to modify the deadline for exercising that property purchase option or had waived the July 1, 1991, closing date with respect to both transactions. The trial court found:

"25. * * * Defendant's right to exercise the Section 11.1 option expired July 1, 1991, unless Defendant prevails on one or more of his affirmative defenses.

"26. Waiver of the 'time of essence' clause as to the closing date for the transfer of business assets could not have affected Defendant's right to exercise the option under Section 11.1, which expired automatically on July 1, 1991. The

deadline for exercising the option was tied to the event of closing only if the closing occurred on or before July 1, 1991. Further, there was no written waiver as required by Section 14.6.[5]

"27. Plaintiff did not represent to Defendant by statements or conduct that Defendant did not need to exercise the option under Section 11.1 by any particular date.

"28. The modification of the Agreement which continued the closing to October 2, 1991, did not result in a modification of the deadline for exercising the option under Section 11.1, nor did it constitute a new agreement concerning that date, which was only tied to the event of closing if it occurred on or before July 1, 1991.

"29. Therefore, Defendant failed to meet his burden of proof as to any of the affirmative defenses asserted."

We review to determine whether defendant has met his burden of proof with respect to the affirmative defenses he has asserted. *Bank of Eastern Oregon v. Griffith*, 101 Or App 528, 534, 792 P2d 1210 (1990); *see* ORCP 19 B (requiring party to affirmatively set forth defenses). Parties to a contract may subsequently modify their written agreement by mutual consent, and may even do so orally, so long as there is consideration for the modification. *Mail-Well Envelope Co. v. Saley*, 262 Or 143, 151-52, 497 P2d 364 (1972). Similarly, a party to a written contract can waive any provision orally or by conduct, despite the existence of a clause requiring any waiver to be in writing. *Moore v. Mutual of Enumclaw Ins. Co.*, 317 Or 235, 241, 855 P2d 626 (1993); *see also* Arthur L. Corbin, *3A Corbin on Contracts* § 763 (1960) (an express provision requiring written modification does not invalidate a subsequent oral agreement to the contrary). Nonetheless, modification and waiver are distinct doctrines and must be separately analyzed. *Mitchell v. Pacific First Bank*, 130 Or App 65, 73 n 6, 75 n 7, 880 P2d 490 (1994).

To be binding, modification of a contract must be supported by consideration. *Jole v. Bredbenner*, 95 Or App

---

[5] Section 14.6 of the separation agreement provides:

"No claim of waiver, consent or acquiescence with respect to any provisions of this Agreement shall be made against either party except on the basis of a written instrument executed by the party claimed to be bound by such waiver, consent or acquiescence. The party benefited by a condition shall have the unilateral right to waive such condition."

193, 196, 768 P2d 433 (1989). Where the terms of a written contract are modified by oral agreement, modification must be shown by clear and convincing evidence. *U.S. Nat'l Bank v. Caldwell*, 60 Or App 639, 649, 655 P2d 180 (1982), *rev den* 294 Or 536 (1983). Here, the trial court found that the parties agreed to a modification of their agreement that allowed them to close the business exchange on October 2, 1991. We see no reason to disturb that finding.

Whether the modification affected the property purchase option deadline, however, is another matter. Both parties acknowledge that between July 1, 1991, and October 1, 1991, the date on which defendant attempted to exercise the section 11.1 option to purchase the property, they had not discussed extension of that option deadline. Nothing in the record clearly and convincingly supports defendant's theory that plaintiff agreed to a modification of the section 11.1 option.

Waiver, unlike modification, does not require consideration and may be undertaken unilaterally. *Mitchell*, 130 Or App at 75 n 7. Nevertheless, a party's intention to waive a contractual right cannot be inferred from his words or conduct, except from a clear and unequivocal act manifesting that intent. *Bank of Eastern Oregon*, 101 Or App at 534. Again, we find nothing in the record that manifests plaintiff's intent to waive the option deadline.

Finally, defendant argues that the trial court erred in holding that there was no evidence that plaintiff understood the section 11.1 property purchase option as continuing until the actual closing of the business exchange. Plaintiff's attorney testified that in late August or early September 1991, he had asked defendant's attorney whether defendant was stalling the business closing because of the purchase or financing of the real property.[6] Defendant argues that that question

---

[6] Plaintiff's attorney responded to a question from the court as follows:

"The Court: Prior to the September 30, 1991, letter, had you, [plaintiff's attorney] any conversation with [defendant's attorney] about the exercise of the option, whether it was 11.1 or 11.2, had there been any discussion prior to this date about his actually exercising the option?

"I'm not talking about the negotiations, and so forth, that led up to the inclusion of the option in the agreement about the actual exercise, had there been any such conversation?

implied that plaintiff "thought the § 11.1 option was still alive, * * * [because] if the only option left was the § 11.2 option, his question would have made no sense." We agree with the trial court, which found that evidence unpersuasive. The asking of that question is neither clear and convincing evidence that plaintiff agreed to modify the deadline for the section 11.1 option, nor a clear and unequivocal manifestation of an intent to waive that deadline.

Defendant's other arguments relate to the interpretation of an ambiguous contract. In the light of our determination that the contract is not ambiguous, we need not address them. Based on the foregoing analysis, the trial court did not err in holding that the section 11.1 option expired on July 1, 1991.

█ Plaintiff cross-appeals the trial court's denial of his request for prejudgment interest from November 27, 1991, the date on which he transferred his interest in the Gresham real property to defendant. Plaintiff argues that the trial court determined that defendant had exercised the section 11.2 property purchase option and that, under that provision of the separation agreement, full payment of the purchase price was due in cash at the time of closing, even though an up-to-date appraisal was not received until August 10, 1993. Defendant responds that any additional sum due to plaintiff under the section 11.2 option was not payable until the up-to-date appraisal determined how much he owed. Therefore, he contends, pursuant to section 11.2, the trial court correctly determined that prejudgment interest did not begin to accrue until October 9, 1993, or 60 days after receipt of the appraisal on August 10, 1993.

Section 11.2 of the separation agreement provides:

"Payment of the purchase price will be in cash at the time of closing [of the real property transaction] which will be within sixty (60) days following the determination of the fair market value."

"[The witness:] The real property was the furthest thing from my mind during that point in time.

"I do recall at one point in I think late August, early September, asking [defendant's attorney] if one of the reasons why this whole thing was getting stalled was the purchase of the real property. And he said, no."

However, as as noted above, the parties executed a separate "Closing Agreement" on November 27, 1991, and closed the real property transaction on that day, despite their dispute regarding the option provisions. That new agreement provides:

> "6. In the event the Court finds that [Defendant]'s exercise of the option to purchase [Plaintiff]'s Equity under Section 11.2 and not Section 11.1, the parties agree to immediately thereafter proceed to implement the procedure set forth in Section 11.2 to determine the fair market value of [Plaintiff]'s Equity at the date of closing specified in Section 2 of this Agreement. The implementation of such procedure shall be under the supervision of the Court and the Court will enter a judgment in favor of [Plaintiff] for the difference between the fair market value of [Plaintiff]'s Equity as so determined and the sum paid to [Plaintiff] at the closing specified in Section 1 of this Agreement. [Plaintiff] contends he is entitled to prejudgment interest and [Defendant] contends that [Plaintiff] is not entitled to prejudgment interest. The Court shall also determine and add to the judgment the amount of interest, if any, to which [Plaintiff] shall be entitled. [Defendant] agrees to pay to [Plaintiff] the amount of such judgment promptly after its entry."

 It is proper for the court to award prejudgment interest when the exact amount owing is ascertained or easily ascertainable by simple computation or generally recognized standards and where the time from which the interest must run can be ascertained. *Gerber v. O'Donnell*, 81 Or App 262, 265-66, 724 P2d 916 (1986). In *Gerber*, the plaintiff had withdrawn from a partnership and sought payment for his share of its value in accordance with procedures contained in the partnership agreement. An appraisal was performed, but it was not completed until well after the time that the agreement required payment. We held that the amount owing could not be ascertained until the appraisal report was completed and awarded interest to accrue from 60 days after that date, the time that payment would have been due had the contract been performed as originally contemplated. *Id.* at 266. That is precisely what the trial court did here. The additional amount owed by defendant was not ascertained until the section 11.2 appraisal was completed on August 10, 1993. If the section 11.2 option had been exercised as originally contemplated in the separation agreement, payment of

the purchase price would have been due within 60 days after receipt of the new appraisal report. Under the closing agreement, however, the parties chose to close the real property transaction before the court determined whether a new appraisal was required. The closing agreement did not alter the fact that the amount owed by defendant could not be ascertained until receipt of a new appraisal. The trial court did not err in ordering interest from October 9, 1993, rather than from November 27, 1991.

Affirmed on appeal and cross-appeal.