HOYT STREET PROPERTIES, L.L.C., an Orregon limited liability company, Plaintiff,

v.

BURLINGTON NORTHERN & SANTA SANTA FE RAILWAY COMPANY, a Delaware corporation, Defendants.

No. CIV. 98–1198–AS.

United States District Court, D. Oregon.

Jan. 14, 1999.

Richard H. Allan, Richard J. Stone, Ball Janik LLP, Portland, for Hoyt Street Properties LLC, Oregon Limited Liability Company, Plaintiffs.

John P. Ashworth, Bullivant Houser Bailey, Pendergrass & Hoffman, Portland, for Burlington Northern & Santa FE Railway Company, Delaware Corporation, Defendants.

## OPINION

ASHMANSKAS, United States Magistrate Judge.

This action raises the issue of who is legally responsible for the costs incurred in the environmental clean up of real property referred to by the parties as the Hoyt Street railyard (the "Property"). Hoyt Street Properties, L.L.C., an Oregon limited liability company ("Plaintiff"), is the present owner of the Property. Defendant Burlington Northern & Santa Fe Railway Company ("Defendant"), or its predecessors, owned and occupied the Property from 1906 to 1988. In 1988, Defendant sold the Property to Glacier Park Company, a wholly-owned subsidiary of Defendant, and leased the Property back pursuant to the terms of a Lease Agreement and Easement dated May 26, 1988 (the "Lease"). Defendant maintained uninterrupted possession of the Property under the Lease through December 31, 1998, when the Lease expired.

Plaintiff contends that Defendant is solely responsible for the clean-up costs of the Property pursuant to the terms of the Lease. Defendant argues that the Lease does not address environmental clean-up costs and imposes no obligation on Defendant to contribute to the clean-up costs incurred by Plaintiff. Additionally, Defendant contends that Plaintiff's claims under the Lease are premature and should be dismissed.

## BACKGROUND

Defendant has used the Property as a major railway station which, at various times, consisted of switching tracks, passenger and freight terminals, docks, car shops, washing facilities, battery shop and diesel fueling station. The fueling facility, which has been in use since 1943, required the installation and use of a number of fuel storage tanks, both above and underground. As of April 1991, at least one underground lube oil tank and one above-

ground diesel fuel tank remained in service.

## Environmental Contamination of the Property

By early 1988, an employee of Defendant had advised Defendant that at least nine separate areas of the Property were "probable areas of major environmental concern." This report was confirmed and expanded upon in February 1998 and January 1990 by two independent contractors retained to prepare environmental assessments for the Property. In September 1991, the Oregon Department of Environmental Quality ("DEQ") documented the release of a number of hazardous substances on the Property. The Property was determined to pose a "significant threat to public health, safety, welfare, or the environment," and was added to the DEQ's "Confirmed Release List". DEQ authorized Defendant to conduct a preliminary assessment for the Property, noting that Defendant had "assumed responsibility for the investigation and cleanup of the contamination."

When Defendant failed to assume the responsibility for monitoring the cleanup of the Property on its own, DEQ listed the Property on its "Inventory of Hazardous Substance Sites" and identified it as a "high priority project" for clean-up in December 1992. DEQ continued, unsuccessfully, to encourage Defendant to voluntarily participate in the cleanup of the Property. In October 1994, DEQ advised Defendant that the complexity of the Property cleanup required a formal agreement and proposed acceptable terms. At this point, Defendant began denying liability for the cleanup and attempted to shift responsibility to Plaintiff. DEQ referred the Property to the enforcement program for cleanup and issued a Consent Order in August 1995 directing Defendant to determine the nature and extent of the contamination and propose appropriate removal or remediation measures. Defendant has yet to comply with the terms of the Consent Order.

## Development Plans for the Property

In the early 1980's, the City of Portland (the "City") began investigating the most beneficial use of the industrial areas along the Willamette River, which included the Property (the "River District"). The focus of the investigation narrowed to retail and residential development and, in March 1988, just prior to the transfer of the Property from Defendant to Glacier Park and the execution of the Lease, the City Council adopted an ordinance that required residential development of the Property with a minimum of 15 dwelling units per acre.

In an effort to encourage timely private development and public investment in the River District, the City Council adopted a plan in which it specifically expressed its vision to extend the downtown northward to the River District (the "Plan"). The Plan emphasized the desire of the City to "encourage a rich urban environment, with housing that reflects the income diversity of the City as a whole, an active street life, a strong network of pedestrian connections, significant open spaces which capitalize on the proximity of the district to the river, and a diversity of architectural styles and scales appropriate to an urban development." The Plan requires "a high density, mixed-use development of the Property which will consist primarily of new residential projects such that, at full build-out, approximately 2,000 to 3,000 new housing units will be built on the Property" and "a series of public and private infrastructure improvements in the area in support of the private development of the Property."

Plaintiff acquired the Property in 1994 and entered into an agreement with the City in September 1997 which set forth a general description of the proposed development of the Property pursuant to the Plan, allocated the responsibilities of the parties and created a time line (the "Development Plan"). The City agreed to remove and reconstruct streets, construct a new streetcar system and develop two

parks within the River District and to commence their work on the Property by March 8, 1999. Plaintiff agreed to defend, indemnify and hold the City harmless from any claims resulting from the presence or release of hazardous substances on the Property.

**Relevant Lease Provisions**

Section 11 of the Lease provides:

Lessee shall indemnify, defend, and hold Lessor and Lessor's affiliated companies, its or their officers, directors, employees, agents and contractors, harmless against and from all claims (including, without limitation, actions, demands, expense, costs, attorneys' fees, court costs and judgments) including, but not limited to, claims for death of or injury to persons whomsoever or loss or destruction of or damage to property whatsoever in any way arising out of or caused or contributed to by the Lessee's presence on or use of the Premises during the term of this Lease including any holdover period, but not otherwise, except when such claims are caused by the sole negligence of Lessor or Lessor's affiliated companies, its or their officers, directors, employees, agents or contractors. The provisions of this Paragraph shall survive the termination of this Lease. For purposes of this Paragraph 11, Lessee shall not be considered an affiliate of Lessor or of Burlington Resources Inc., or any of its subsidiaries.

Section 13 of the Lease provides:

Upon termination of this Lease, Lessee shall have the right to remove and Lessor shall have the option to require Lessee to, at Lessee's sole cost and expense, remove or cause to be removed all buildings, structures, railroad tracks and equipment, foundations, footings, materials, signs or signboards, debris, articles or other facilities which have been placed upon the Premises after the commencement of this Lease ("Improvements") located on, above or below the surface of the Premises. In addition, at any time during the term of this Lease,

Lessee shall have the right to remove, at Lessee's sole cost and expense, all buildings, structures, railroad tracks and equipment, foundations, footings, materials, signs or signboards, debris, articles, or other facilities placed upon the Premises prior to the commencement of this Lease. Lessee agrees to return the Premises to Lessor in substantially the same condition as they existed on the commencement of this Lease subject to casualty losses occurring during the term hereof and subject to removal of improvements and other items pursuant to this Section 13.

In the event that either party elects to have improvements removed by Lessee, it is expressly understood by Lessee that until such time as the Premises are surrendered to Lessor free and clear of all Improvements, and the Premises are placed in the condition required by this Section 13, Lessee shall be liable to Lessor for such rental and additional rental, including taxes, at the rent as established in this Lease.

Furthermore, should Lessee fail to remove said property of Improvements required pursuant to this Section 13, Lessee hereby grants Lessor the absolute right to keep, convey, destroy, or otherwise dispose of the Improvements in any manner Lessor chooses, and in addition, Lessee agrees to pay any costs incurred by Lessor in doing so, within ten (10) days of receipt of Lessor's statement therefor.

The provisions of this Paragraph shall survive the termination of this Lease.

The parties to the Lease first specifically addressed the environmental contamination of the Property in the first amendment to the Lease which provided, in pertinent part:

Lessee shall, at its expense and not later than May 1, 1991, prepare and deliver to Lessor a corrective action plan to remediate soil and ground water contamination of the Premises. Such plan shall be prepared in accordance with all

requirements of the Oregon Department of Environmental Quality. The requirements of this Section shall not be deemed to imply that Lessee is solely responsible for paying the cost of preparation of such corrective action plan or that Lessee is solely responsible for the cost of implementing such plan.

In the second amendment to the Lease, the parties again addressed the environmental condition of the Property and provided:

Section 7 of the First Amendment requires the preparation and delivery by Lessee of a corrective action plan to remediate contamination of the Premises. Lessee shall prepare a corrective action plan meeting the requirements of the First Amendment for submission as soon as practicable to the Oregon Department of Environmental Quality (DEQ) and shall use its best efforts to ensure that such plan, with such modifications by Lessee as are necessary, is approved in due course by DEQ.

## LEGAL STANDARD

### Motion to Dismiss

Courts grant motions to dismiss under Rule 12(b)(6) only if "it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Gibson v. United States,* 781 F.2d 1334, 1337 (9th Cir.1986), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987). The review is limited to the complaint, and all allegations of material fact are taken as true and viewed in the light most favorable to the non-moving party. *Cassettari v. County of Nevada,* 824 F.2d 735, 737 (9th Cir.1987).

### Motion for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure allows the granting of summary judgment:

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). "[T]he requirement is that there be no *genuine* issue of *material* fact." *Anthes v. Transworld Systems, Inc.,* 765 F.Supp. 162, 165 (D.Del.1991) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986))(emphasis in original).

The movant has the initial burden of establishing that no genuine issue of material fact exists or that a material fact essential to the nonmovant's claim is absent. *Celotex v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met its burden, the onus is on the nonmovant to establish that there is a genuine issue of material fact. *Id.* at 324, 106 S.Ct. 2548. In order to meet this burden, the nonmovant "may not rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome of the case. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Factual disputes are genuine if they "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. On the other hand, if after the court has drawn all reasonable inferences in favor of the non-moving party, "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

## DISCUSSION

In the Second Claim for Relief, Plaintiff alleges that Defendant has breached the terms of Section 11 and Section 13 of the Lease by refusing to assume responsibility for the cleanup of the Property. In the Fourth Claim for Relief, Plaintiff seeks a

declaratory judgment from the court that the terms of Section 11 and Section 13 apply to the responsibility and costs of removing the hazardous substances present on the Property. Defendants moves to dismiss these claims and Plaintiff seeks summary judgment on the Fourth Claim for Relief.

## Motion to Dismiss

Defendant contends that Plaintiff's Second and Fourth Claims for Relief should be dismissed to the extent they seek recovery for any acts predating the Lease. A careful reading of the claims establishes that Plaintiff seeks nothing more than indemnification for costs incurred in removing contamination of soil which "arises out of or was caused or contributed to by Defendant's presence on or use of the Property during the term of the lease" and the removal of hazardous materials which Defendant "placed upon the Property during the term of the Lease Agreement." Plaintiff's claims are already limited to acts occurring during the term of the Lease. Accordingly, Defendant's motion to dismiss on this ground is without merit.

██ Defendant argues that Plaintiff's claims for declaratory judgment based on the terms of the lease are premature and should be dismissed. Article III of the United States Constitution provides that parties seeking to invoke the powers of the federal courts must demonstrate the existence of an actual case or controversy. In actions requesting prospective or declaratory relief, the plaintiff must show that there is a "substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). In other words, a plaintiff must show that it is immediately in danger of sustaining some direct injury and that the threat of injury is real and immediate, not conjectural or hypothetical. *Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

██ Defendant asserts that Plaintiff is unable to establish a controversy under Section 11 of the Lease because Plaintiff has failed to allege that it is the subject of a third-party claim for environmental clean up costs. Additionally, Defendant contends that any prospective claim for indemnity against Plaintiff by the City under the Development Plan is too speculative to support a claim for declaratory relief at this time.

Plaintiff alleges in the Complaint that it "is now incurring and will continue to incur fees, costs and expenses in connection with cleaning up the damage to the Property arising out of, caused or contributed to by the defendant's presence on and use of the Property during the term of the Lease Agreement." Plaintiff seeks a determination by the court that Defendant is liable, under the terms of Section 11 to the Lease, to reimburse Plaintiff for these expenses. Plaintiff has presented a substantial and actual controversy and is entitled to declaratory relief. The fact that Plaintiff may incur additional expenses as a result of the clean up of the environmental contamination to the Property does not deprive Plaintiff of such relief.

██ Defendant argues that Plaintiff's claim for declaratory relief under Section 13 does not present a controversy because Defendant is not required to remove any improvements until the Lease has expired. At the time the motion was filed, the Lease was still in effect. However, the Lease term expired on December 31, 1998, and Defendant has not presented any evidence that it subsequently agreed to comply with the provisions of Section 13. Accordingly, this argument is currently without merit.

Defendant also argues that "the plain meaning of [Section 13] shows [Defendant] has no Lease-based obligation to remove contamination from the [P]roperty" and that Plaintiff is unable to assert a true controversy regarding Defendant's obligation under Section 13. By asking the court to dismiss Plaintiff's request for de-

claratory relief with regard to Section 13, Defendant seeks a finding by the court that the language of Section 13 clearly and expressly excludes environmental contaminants from the definition of "Improvements". In a round-about way, Defendant is also seeking declaratory relief from the court.

It is evident that Plaintiff and Defendant are parties with adverse interests, that a controversy over the construction of the term "improvements" in Section 13 exists and that the threat of injury to Plaintiff is real and immediate, not conjectural or hypothetical. Accordingly, the court finds that a genuine case or controversy exists with regard to the proper construction of Section 13 and that this court has jurisdiction over Plaintiff's Section 13 claims.

Finally, Defendant argues that Plaintiff's claims under the Lease must be dismissed because Section 11 and 13 clearly do not apply to the indemnification for or removal of environmental contaminants on the Property. As noted above, the court views this argument more as a counterclaim for declaratory relief rather than an affirmative defense based on a failure to state a claim. The fact that the parties dispute the proper interpretation of the language of Section 11 and 13 supports a finding that the Plaintiff has stated a valid claim under the Lease. Defendant's motion to dismiss is denied. The court will address Defendant's arguments on the appropriate construction of Section 11 and Section 13 in its discussion of Plaintiff's motion for partial summary judgment. .

**Motion for Partial Summary Judgment**

Plaintiff seeks a declaration from the court that Section 11 and Section 13 apply to the responsibility and costs of removing the environmental contamination occurring during the term of the Lease. Plaintiff does not request a finding that Defendant is currently in breach of either of these sections at this time.

As noted above, Section 11 requires Defendant to indemnify, defend and hold Plaintiff harmless from all claims "including, but not limited to, claims for death of or injury to persons whomsoever or loss or destruction of or damage to property whatsoever in any way arising out of or caused or contributed to by [Defendant's] presence on or use of the Premises during the term of this Lease." The term "claim" is defined as "including, without limitation, actions, demands, expenses, costs, attorneys' fees, court costs and judgments." Defendant contends that Plaintiff must prove the existence of a third-party claim against to be entitled to indemnification. Additionally, Defendant argues that because Section 11 does not expressly list environmental contamination as a covered "damage to property," the section does not obligate Defendant to indemnify Plaintiff for contamination.

■ Under Oregon law, the construction of a contract is a question of law for the court. *Anderson v. Divito*, 138 Or. App. 272, 277, 908 P.2d 315 (1995)(citing *Timberline Equip. Co., Inc. v. St. Paul Fire & Marine Ins. Co.*, 281 Or. 639, 643, 576 P.2d 1244 (1978)). The court's goal is to give effect to the intention of the contracting parties. *Anderson v. Jensen Racing, Inc.*, 324 Or. 570, 575–76, 931 P.2d 763 (1997)(citing *Investment Serv. Co. v. Smither*, 276 Or. 837, 843, 556 P.2d 955 (1976) and Or.Rev.Stat. 42.240 (in the construction of a written instrument the intention of the parties is to be pursued if possible)).

■ "To interpret a contractual provision, ..., the court follows three steps. First, the court examines the text of the disputed provision, in the context of the document as a whole." *Yogman v. Parrott*, 325 Or. 358, 361, 937 P.2d 1019 (1997). "If the provision is clear, the analysis ends." *Id.*

"When considering a written contractual provision, the court's first inquiry is what the words of the contract say .....
To determine that, the court looks at the four corners of a written contract, and considers the contract as a whole with emphasis on the provision or provisions in question. The meaning of disputed text in that context is then determined.

In making that determination, the court inquires whether the provision at issue is ambiguous. Whether terms of a contract are ambiguous is a question of law. In the absence of an ambiguity, the court construes the words of a contract as a matter of law."

*Id.* (quoting *Eagle Industries, Inc. v. Thompson,* 321 Or. 398, 405, 900 P.2d 475 (1995))(ellipsis in *Yogman* ).

■ A contract or term is unambiguous if it has only one sensible and reasonable interpretation. *D & D Co. v. Kaufman,* 139 Or.App. 459, 462, 912 P.2d 411 (1996). For a contract or term to be legally ambiguous, it must be susceptible to at least two plausible interpretations when examined in the context of the contract as a whole. *Moon v. Moon,* 140 Or.App. 402, 407, 914 P.2d 1133, *rev. den.,* 323 Or. 484, 918 P.2d 848 (1996).

■ If the contractual provision at issue is still ambiguous after examining the text and its context, the second step "is to examine extrinsic evidence of the contracting parties' intent." *Yogman,* 325 Or. at 363, 937 P.2d 1019. In determining whether an ambiguity exists, the court may consider parol and other extrinsic evidence. *Moon,* 140 Or.App. at 407, 914 P.2d 1133; *see also Adams v. Knoth,* 102 Or.App. 238, 243–44, 794 P.2d 796 (1990)("[i]n deciding if the language of a contract is ambiguous, it is proper for the court to consider extrinsic evidence regarding the circumstances under which an agreement was made or to which it relates."). The parties' "practical construction of an agreement may hint at their intention." *Yogman,* 325 Or. at 364, 937 P.2d 1019.

If the first two analytical steps have not resolved the ambiguity, the court proceeds to the third and final analytical step: the use of "appropriate maxims of construction." *Id.* Presumably, if the language is still ambiguous, then what the parties intended by that language is to be decided by the trier of fact. *See Oregon Sch. Employees Ass'n v. Rainier Sch. Dist. No. 13,* 311 Or. 188, 194, 808 P.2d 83 (1991)

("[i]f [contract terms] are ambiguous, then the trier of fact is to ascertain the intent of the parties and construe the contract consistently with their intent.").

When construing indemnification agreements, the Oregon courts recognize a few additional rules:

Indemnity provisions, when they appear in agreements having a primary purpose other than indemnity itself, are viewed as realistic attempts to allocate business risks among the parties and should be given a reasonable construction. Like other contracts, indemnity agreements are usually to be interpreted according to the plain meaning of the language employed, where such meaning is unambiguously expressed. Where the language use is ambiguous in the context of the entire contract, it must be interpreted in light of the surrounding circumstances and the situation of the parties so as to effectuate the parties intent. If thereafter doubts remain, they are generally resolved against the party which drafted the contract. Indemnity provisions are construed against holding that coverage extends to the negligence of the indemnitee, unless a contrary intention clearly appears, expressly or out of the circumstances of the parties and their relationship.

*Cook v. Southern Pacific Transportation Co.,* 50 Or.App. 547, 552, 623 P.2d 1125 (1981) (citations omitted.)

■ The plain meaning of the term "claim" as used in Section 11 encompasses all claims accruing as a result of Defendant's presence on the Property during the Lease. This broad construction is supported by the use of the language "including, without limitation" in the introduction to the definition of the term "claim" and the general application of the terms included within the definition. Plaintiff has alleged that it has incurred "fees, costs and expenses" in connection with cleaning up the hazardous materials left on the Property by Defendant. To the extent these fees, costs and expenses are related to damage to the Property caused or contrib-

uted to by Defendants presence on the Property during the Lease, Plaintiff is entitled to indemnification from Defendant under Section 11.

■ Similarly, the court finds that the generally inclusive language of the description of the claims covered by Section 11 encompasses claims relating to loss, damage or destruction to property, including the Property, arising out of Defendant's presence on the Property during the term of the Lease. The use of all encompassing descriptive phrases, such as "including but not limited to," "whatsoever," and "in any way arising" requires a broad construction of the indemnification provision. However, the unambiguous language of Section 11 expressly limits the indemnification protection to the environmental damage "arising out of or caused or contributed to by [Defendant's] presence on or use of the [Property] during the term of the Lease." Additionally, Plaintiff is not entitled indemnification for costs incurred in remedial measures intended solely to prevent future contamination of the Property. See *Hays v. Mobil Oil Corporation*, 930 F.2d 96 (1st Cir.1991)(adopting Massachusetts Supreme Judicial Court ruling in *Hazen Paper Co. v. United States Fidelity and Guaranty Co.*, 407 Mass. 689, 555 N.E.2d 576 (1990).) This construction of Section 11 holds Defendant liable for damage to the Property occurring while it was in sole possession of the Property.

Defendant argues that the lack of reference to environmental contamination in Section 11 requires a finding that the Lease does not require it to indemnify Plaintiff for the remediation of contamination. The court does not find this persuasive in light of the broad, general language used in Section. See *Olin Corporation v. Yeargin Incorporated*, 146 F.3d 398, 407–8 (6th Cir.1998). Additionally, an argument can be just as easily made that the lack of an exclusion of environmental contamination requires a finding that such claims are included in Section 11.

Finally, Defendant argues that the amendments to the Lease establish that the parties did not intend to allocate remediation responsibilities under the Lease. Defendant relies on the language in the first amendment providing that "[t]he requirements of this Section shall not be deemed to imply that Lessee is solely responsible for paying the cost of preparation of such corrective action plan or that Lessee is solely responsible for the cost of implementing such plan" and asserts that this language makes it clear that the Lease did not allocate remediation responsibilities. It is clear that the parties to the first amendment intended the language above to relate solely to the section referenced and was not an interpretation of the language under the Lease. This is supported by the provisions in both the first and second amendments which provides "[e]xcept as expressly amended by this [amendment], the Lease shall remain unmodified and in full force and effect."

The only reasonable construction of the language "damage to property whatsoever in any way arising out of or caused or contributed to by" Defendant's presence on the Property during the Lease includes environmental contamination of the Property. Plaintiff is entitled to declaratory relief that Section 11 applies to environmental contamination. However, Plaintiff's right to indemnification under Section 11 is limited to claims for actual damage to property, which includes the Property, arising out of, caused or contributed to by Defendant's presence on the Property during the term of the Lease. Additionally, Plaintiff is not able to recover for costs related to preventing future contamination.

■ Defendant argues that Section 13 does not require it to remove environmental contamination because the definition of "Improvements" does not explicitly include hazardous materials and because the doctrine of *ejusdem generis* requires the court to find that contamination is excluded from the definition of Improvements. The court has addressed Defendant's argument that the absence of a specific reference to environmental contamination requires a finding that the environmental contamination

**1194**

was not covered by the Lease in its discussion of Section 11 above. The court finds this argument no more persuasive as it pertains to Section 13 and rejects this argument.

■ The doctrine of *ejusdem generis* is a rule of contract construction and has been described by the Oregon Supreme Court as follows:

> Basically, the rule provides that when general words follow an enumeration of specific persons or things, the general words are not construed in their widest extent, but are applied only to persons or things of the same general kind or class as those specifically enumerated. In addition, the rule of *ejusdem generis* in contracts is particularly applicable where specific enumeration precedes the word "other" followed by general words.

*McGrath v. Electrical Construction Company*, 230 Or. 295, 307, 364 P.2d 604 (1961). This doctrine is not itself a rule of law, but is merely a guide in determining the intent of parties to a contract and must be considered in conjunction with all other rules of construction. *Estate of Moore v. Schermerhorn*, 210 Or. 23, 31 (1957).

Section 13 provides that Defendant shall, at its own expense, remove all Improvements placed on the Property during the term of the Lease. If such Improvements are not removed upon the termination of the Lease term, Plaintiff is entitled to remove the Improvements in a manner it sees fit and recover the expense of such removal from Defendant. The term Improvements is defined as "buildings, structures, railroad tracks and equipment, foundations, footings, materials, signs or signboards, debris, articles or other facilities which have been placed upon the [Property] after the commencement of this Lease * * * located on, above or below the surface of the [Property]."

Defendant argues that the doctrine of *ejusdem generis* requires the court to limit the meaning of the terms "articles, materials or debris" to a meaning that is similar to the other words mentioned in the definition of Improvements, which are "buildings, structures, railroad tracks and equipment, foundations, footings, signs or signboards, and other facilities." The court does not interpret the doctrine in the same manner. Application of the doctrine to the definition of Improvements would require limiting the meaning of "other facilities" as similar and related to the specifically enumerated items which precede it. It would have no effect on the specifically enumerated items, which include "articles, materials or debris."

Even taking the definitions proffered by Defendant, the court finds that the only reasonable interpretation of the terms "articles, materials or debris" would include environmental contaminants. Defendant defines "article" as an "item; a commodity or object." A primary source of the contamination on the Property is diesel or fuel oil, which clearly qualifies as a commodity and was productively used by Defendant in its railyard operations. The same can be said for the lead used by Defendant for its batteries. Additionally, the lead is a substance out of which something can be fashioned, which qualifies it as a material under Defendant's definition. Once the usefulness of both the diesel or fuel oil and lead is gone, it can be characterized as waste, rubble or ruins, which falls within Defendant's definition of debris.

Section 13 applies to all Improvements located on, above or below the surface of the Property. The fact that the hazardous materials used by Defendant have been either intentionally dumped or allowed to leach below the surface of the Property does not alter their characterization as Improvements nor does it reduce Defendant's obligation to remove under the terms of Section 13 of the Lease.

The unambiguous, reasonable interpretation of Section 13 requires Defendant to remove any and all hazardous material or environmental contamination placed on the Property during the term of the Lease. The court notes that the protection afforded to Plaintiff under Section 13 is limited solely to contamination occurring after May 26, 1988. This Section does, however,

apply to the removal of any storage tanks placed on the Property after this date as well. Plaintiff is entitled to receive the Property in the same condition it was in as of May 26, 1988. If Defendant refuses to remove the Improvements itself, Plaintiff is entitled to pursue the alternative avenues of relief provided in Section 13.

## CONCLUSION

Defendant's motion (# 14) to dismiss is DENIED. Plaintiff's motion (# 8) for summary judgment on Counts 1 and 2 of its Fourth Claim for Relief is GRANTED. Plaintiff is entitled to indemnification under Section 11 for all claims related to actual damage to the Property arising out of or caused or contributed to by the Defendant's use of environmental contaminants on the Property during the term of this Lease. Plaintiff is not entitled to indemnification for costs related to preventing future contamination under Section 11. Additionally, Section 13 requires Defendant to remove any and all environmental contaminants placed on the Property during the term of the Lease. If Defendant refuses to remove the contaminants, Plaintiff is entitled to pursue the alternative avenues of relief provided in Section 13.