Filed 12/16/21  Vitec Electronics v. Veris Industries CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| VITEC ELECTRONICS CORP., | G058388 (consol. w/ G058864, G058923 & G059123) |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 30-2016-00876606) |
| VERIS INDUSTRIES, LLC et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeals from judgments and postjudgment orders of the Superior Court of Orange County, Melissa R. McCormick and William D. Claster, Judges.  Affirmed in part, reversed in part, and remanded with directions.

Business Law Group and Joseph A. Lara for Plaintiff and Appellant.

Barnes & Thornburg, Seth A. Gold, Matthew B. O'Hanlon and L. Rachel Lerman for Defendants and Appellants.

\*　　　\*　　　\*

## INTRODUCTION

In these four consolidated appeals, we affirm an amended judgment, all of the posttrial orders with one exception, and an order granting summary adjudication. We reverse only, in part, a postjudgment order awarding attorney fees.

In this business dispute between corporations, Vitec Electronic Corp. (Vitec) sued Veris Industries, LLC (Veris), Schneider Electric USA, Inc. (Schneider), and Pacific Transformer Corporation (PacTran) (Veris, Schneider, and PacTran are referred to collectively as Defendants). Vitec alleged that Veris and Schneider had breached three contracts, including a nondisclosure agreement, and that Defendants had misappropriated Vitec's trade secrets.

The trial court granted summary adjudication against Vitec on its breach of contract claims. Vitec's misappropriation of trade secrets claim was tried to a jury. At trial, Vitec contended that Veris and Schneider had misappropriated six part drawings for a Vitec product and that PacTran had improperly acquired the part drawings and used them to design and manufacture a product to sell to Veris at a discounted price.

The jury found in favor of Vitec and awarded it damages. Judgment was entered. The trial court granted Defendants' motion for judgment notwithstanding the verdict (JNOV) on the ground substantial evidence did not support the jury's findings that the part drawings were trade secrets. An amended judgment was entered. The trial court granted Defendants' motion for attorney fees based on an attorney fees provision in the nondisclosure agreement. After attorney fees were awarded, a second amended judgment was entered.

Vitec appealed from the amended judgment and from the order awarding attorney fees. In addition to the JNOV, Vitec challenges the order granting summary adjudication and the pretrial orders denying its requests to continue the trial date, reopen discovery, and for leave to amend its complaint and trade secret identification.

Defendants also appealed from the order awarding attorney fees and brought a protective cross-appeal from the judgment entered on the jury verdict.

We affirm the second amended judgment except to the extent it includes an award of attorney fees. The trial court did not err by granting summary adjudication of Vitec's breach of contract claims. The trial court properly exercised its discretion by denying Vitec's requests to continue the trial date, reopen discovery, and for leave to amend its complaint and trade secret identification. We affirm the JNOV because substantial evidence did not support the jury's findings that the six part drawings that were the basis for Vitec's misappropriation of trade secrets cause of action were trade secrets.

We reverse the order awarding attorney fees but only on the ground that the trial court erred by determining the amount of the fee award based on prevailing hourly rates in Portland, Oregon, rather than in Orange County. The scope of remand is limited: We remand with directions to the trial court to determine and consider the hourly rates customarily charged in Orange County for similar legal services and, in the exercise of its discretion, determine a reasonable amount of fees.

We commend Judge Claster, who presided over the trial and decided the posttrial motions, and Judge McCormick, who decided the pretrial motions, for their thorough analysis and for creating excellent records for appellate review.

## FACTS

### I. The Parties and the Nondisclosure Agreement

Vitec is a California corporation that designs and manufactures "unique magnetic components" for electronic power systems. Veris is an Oregon limited liability company that sells electronic power systems measuring the amount of energy used by programs. Schneider is a Delaware corporation, and Veris is a wholly owned subsidiary of Schneider. PacTran is a California corporation that designs and manufactures components used in electronic power systems.

3

Beginning in about 1998, Vitec and Veris began a business relationship in which Vitec built magnetic components for Veris. In May 2006, Vitec and Veris entered into a contract called a confidentiality and nondisclosure agreement (the 2006 NDA) which had, as its stated purpose: "Veris and Vitec intend to explore a business relationship in the course of which either or both parties may disclose certain Proprietary Information as defined hereinafter."

Five provisions of the 2006 NDA are particularly relevant to these appeals:

**1. Confidentiality/Nondisclosure.** The 2006 NDA has a confidentiality/nondisclosure provision stating in part: "[N]either party shall publish, disseminate nor disclose in any manner to any third party, Proprietary Information disclosed to it either directly or indirectly and each party shall maintain all such information in strictest confidence unless otherwise authorized." We refer to this provision as the Confidentiality Provision. The obligations of the Confidentiality Provision expired two years from the date of the 2006 NDA (i.e., May 2008.)

**2. Nonutilization.** The 2006 NDA has a nonutilization provision stating in part: "Neither party shall utilize any part of the Proprietary Information provided by the other party pursuant to this Agreement except for exploration of the business relationship for which this Agreement was executed." We refer to this provision as the Nonutilization Provision. The Nonutilization Provision is not subject to the two-year expiration date.

**3. Written Amendments.** The 2006 NDA has a provision stating it can only be amended "by a signed writing."

**4. Attorney Fees.** The 2006 NDA has an attorney fees provision stating: "In the event of any dispute with respect to the subject matter of this Agreement, the prevailing party shall be entitled to such party's reasonable attorneys' fees, expenses, and court costs incurred in resolving or settling the dispute (including such fees, expenses and court costs incurred at trial or on appeal)."

4

**5. Choice of Law/Forum Selection.** The 2006 NDA has a choice of law/forum selection provision stating: "This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Oregon, excluding principles of conflict of law. For all disputes relating to this Agreement, each of the parties hereto consents to the jurisdiction of the courts of the State of Oregon, and agrees that such courts shall have personal jurisdiction over each of the parties hereto. Venue for all disputes relating to this Agreement shall be only in Multnomah County Circuit Court."

## II. Development of Current Sense Transformers and Creation of Part Drawings

When the 2006 NDA was signed, Vitec had been selling Veris a version of a current sense transformer (CST), identified as part No. 57P1699. Current sense transformers are electronic devices that measure current in electronic power systems and assist with power management. Sometime after the 2006 NDA was signed, Vitec began designing another version of the CST for use in Veris's branch circuit power monitoring systems. Veris provided Vitec design inputs reflecting Veris's performance expectations.

Vitec was able to design and manufacture a CST that met Veris's performance expectations. Part drawings of this CST were prepared. Part drawings are similar to or the same as a technical drawings or blueprints.

For three years after the 2006 NDA was signed, Vitec did not convey any confidential information to Veris. In about July 2009, Vitec modified and added more proprietary design aspects to the part drawings of the CST. These modified drawings incorporated the previous design.

## III. Proposed New Nondisclosure Agreement and Proposed Supply Agreement

In June 2012, Schneider expressed concern over a "sizeable gap" between the price of Vitec products and price quotations of other suppliers and sought to negotiate

a lower price from Vitec for the CST's. Brad Rogers (Vitec's vice-president and general manager) responded in an e-mail stating: "I speculate that the quotes received from the others are lower due to Vitec knowing the full extent of what is required to supply these products as opposed to the belief that others might have a cost advantage. [And] [i]t's unclear to me how others could provide a reasonable quote knowing that the parts were designed by Vitec and are proprietary technology covered under a mutual non-disclosure." Rogers forwarded a copy of the 2006 NDA to Schneider. Rick Anderson, a regional commodity manager at Schneider, reviewed the 2006 NDA and told Veris it had expired.

Schneider sent Vitec a proposed new nondisclosure agreement in May 2014 (the 2014 NDA). The 2014 NDA had a nondisclosure provision similar to the one in the 2006 NDA. Schneider requested that Vitec sign and return the 2014 NDA. No party signed the 2014 NDA.

In August 2014, Vitec sent to both Veris and Schneider a proposed supply agreement (the Supply Agreement) between Vitec and Veris. The Supply Agreement states it was intended to "confirm[] the understanding that Vitec would not sell the CST's that Vitec designed and manufactured for Veris/Schneider to any other competitor in exchange for Veris/Schneider's promise to not divulge Vitec's confidential drawings." The proposed Supply Agreement included a nondisclosure provision, a price increase, and an exclusive arrangement provision stating the agreement "is an exclusive arrangement and that Veris may not purchase items, goods and products that are similar or identical to the Products from alternate sources unless when [Vitec] is unable to supply Veris with products listed in Exhibit A."

The Supply Agreement was signed by Vitec but not by Veris or Schneider. Veris and Schneider did agree to a price increase, and parts subsequently purchased by Veris were priced according to the schedule in the Supply Agreement.

## IV.  Disclosure of Part Drawings

In August 2015, Vitec informed Veris that confidential Vitec part drawings had appeared on Ariba, an online bidding platform operated by Schneider.  Vitec warned Schneider that "[t]he sharing of our designs, such as you have done on the Ariba portal, is a breach of the mutual confidentiality agreement."  Dan Alder of Schneider[1] responded with an e-mail stating:  "[Ariba] is a secured site that we used to communicate to you the requirements that we are looking for.  We are not sharing your drawings with other suppliers. . . .  The [request for quote] of your drawings went to you only."

Rogers responded with an e-mail expressing his disagreement with Alder's assertion that Vitec's confidential data had not been compromised.  Rogers demanded that Vitec's confidential information be "retrieved from unauthorized third parties and taken off the Ariba portal."

In an e-mail to Rogers dated August 19, 2015, Alder stated:  "I have shared your comments with our teams both at Veris and in Asia.  The teams agree that although the product specifications are developed by Veris, the part drawings that you have created and marked confidential should not be shared with unauthorized parties.  There is a commitment from everyone that we will take greater measures to protect your drawings."  Vitec later learned in discovery that Veris had disclosed four Vitec part drawings to a PacTran employee.

## PROCEDURAL HISTORY

## I.  Complaints and Allegations

In September 2016, Vitec initiated the lawsuit by filing a complaint against Defendants for misappropriation of trade secrets and various torts.  Vitec's third amended complaint (Vitec's complaint) asserted three causes of action:  (1) misappropriation of

---

[1]  None of the parties has ever identified Alder's position or title at Schneider.  The appellate record discloses that Alder was an electronics regional commodity manager at Schneider.

trade secrets, (2) breach of contract (Confidentiality Provisions of the 2006 NDA and the 2014 NDA, and the exclusive arrangement provision of Supply Agreement), and (3) breach of contract (Nonutilization Provision of the 2006 NDA).

Vitec's complaint alleged: (1) Veris and Schneider had misappropriated proprietary part drawings by posting them on Ariba, "which is accessible to suppliers throughout the world"; (2) PacTran had improperly acquired the part drawings, which had been marked confidential, and used them to design and manufacture CST's and sell them at a discounted price to Veris and Schneider; and (3) Veris and Schneider had breached the Confidentiality Provision of the 2006 NDA and had "[e]ffected an executed oral modification and renewal of the confidentiality provision."

Vitec's complaint also alleged that Veris and Schneider had breached the confidentiality provisions of the 2014 NDA and the Supply Agreement, and the exclusive arrangement provision of the Supply Agreement, by purchasing from PacTran CST's similar or identical to those made by Vitec. Vitec's complaint alleged that Veris and Schneider had breached the nonutilization provision of the 2006 NDA "when it gave [Vitec]'s part drawings to Pac[Tran] so that Pac[Tran] could manufacture and sell the part to Veris/Schneider."

## II. Motion for Summary Judgment/Summary Adjudication

Defendants filed a joint motion for summary judgment or summary adjudication of issues. The trial court denied summary judgment but granted summary adjudication against Vitec on its breach of contract causes of action and punitive damages claim. The court concluded the Confidentiality Provision of the 2006 NDA had expired after two years and was not renewed, Vitec failed to show a triable issue as to whether the communications between the parties created an enforceable oral or de facto agreement, and the doctrines of part performance and promissory estoppel did not apply. The court found that neither the 2014 NDA nor the Supply Agreement was signed and neither

8

created a binding agreement. The court concluded the Nonutilization Provision of the 2006 NDA could not have been breached because it covered only proprietary information provided by Vitec "pursuant to this Agreement," and Vitec did not provide Veris or Schneider any information pursuant to the 2006 NDA.

The trial court granted summary adjudication of Vitec's claim for punitive damages on the ground that Vitec had failed to raise a triable issue of fact regarding whether the act of posting the part drawings on Ariba was oppressive, fraudulent, or malicious. Further, the court found that Vitec had not shown that any employee involved in posting the part drawings on Ariba was a director, officer, or managing agent of Veris or that Schneider knew in advance of the unfitness of the employee who posted the part drawings on Ariba, or ratified disclosure of the part drawings.

### III. Vitec's Application to Continue Trial, Reopen Discovery, and for Leave to Amend Complaint and Trade Secret Identification

In October 2017, Vitec served a trade secret identification, which is required by Code of Civil Procedure section 2019.210 to commence discovery in trade secret litigation. Vitec's amended identification of trade secrets, which was served in February 2018, identified 39 CST part drawings as the trade secrets in issue.

Trial originally was scheduled to begin in November 2017 and was continued several times at Vitec's request to March 11, 2019. On February 14, 2019, Vitec applied ex parte for an order to again continue the trial date, reopen discovery, and grant Vitec leave to amend its trade secret identification based on discovery responses from PacTran. The basis for these requests is explained in part II of the Discussion. Defendants opposed the requests.

On February 28, 2019, the trial court issued a minute order denying all of Vitec's requests. The court found that Vitec had failed to include with its application a proposed amended complaint as required by California Rules of Court, rule 3.1324, and

9

that Vitec had not demonstrated good cause for continuing the trial, reopening discovery, or amending its complaint and trade secret identification. The court also concluded that granting Vitec the relief it requested would cause Defendants to suffer prejudice.

## IV. Trial and Judgment

The trial commenced on Vitec's misappropriation of trade secrets cause of action in April 2019. As tried, Vitec's claim for misappropriation of trade secrets was based on six of the 39 part drawings initially identified in Vitec's trade secret identification. The six part drawings in issue were received into evidence as plaintiff's exhibits 127, 129, 130, 132, 134, and 141, and were made attachments to the jury verdict.[2]

Vitec sought damages based on future lost profits. The theory presented was that once trial was over, Veris would purchase CST's from PacTran instead of Vitec.

The jury returned a special verdict in favor of Vitec and awarded it $216,296.38 in compensatory damages. The jury found that each of the six part drawings was a trade secret and that Veris, Schneider, and PacTran each had acquired, used, or disclosed the part drawings by improper means. Judgment was signed and entered based on the jury verdict and the order granting summary adjudication against Vitec.

## V. Motion for JNOV

Defendants moved for a JNOV on the grounds the verdict was not supported by substantial evidence and Vitec had failed to prove damages. Vitec opposed the motion.

The trial court granted the JNOV motion. The court concluded the evidence did not support a finding that the six part drawings were trade secrets: "At trial [Vitec] limited its trade secret claim to six part[] drawings. These drawings mostly

---

[2] The exhibit numbers and Vitec part number for the drawings are: exhibit 127 (57P1699XX), exhibit 129 (57P1701XX), exhibit 130 (57P1710XXX), exhibit 132 (57P1711XXX), exhibit 134 (57P1712XXX), and exhibit 141 (57PR1708XX).

10

contain specifications and measurements pertaining to the transformers, and, in contrast to the various material introduced at trial, do not contain information as to *how* to manufacture these parts." The court found the part drawings had no independent economic value because the only allegedly proprietary information included in the drawings could be ascertained easily by looking at the CST's or taking measurements of them. The court found that the part drawings might save Vitec's competitors the time and effort of taking measurements and conducting tests, but "the uncontroverted evidence shows that the time saved is de minimis, particularly when compared to the 18 months that [Vitec] argued would be saved by a competitor who possessed the drawings."[3]

Based on the order granting the JNOV motion, the judgment was vacated and an amended judgment (the amended judgment) in favor of Defendants on all causes of action was entered.

### VI. Attorney Fees and the Second Amended Judgment

Defendants filed a joint motion to recover attorney fees pursuant to the California Uniform Trade Secrets Act (UTSA, Civ. Code, § 3426 et seq.) and the attorney fees provision of the 2006 NDA. Defendants requested a total of $2,438,155.34 under the UTSA or $2,335,263.56 under the other sources of recovery. Vitec opposed the motion for attorney fees.

The trial court issued two orders on the attorney fees motion. In the first order, the court denied the motion for attorney fees insofar as it was based on the UTSA. In the second order, the court concluded that Defendants could recover attorney fees under the fee provision of the 2006 NDA and awarded attorney fees of $1,086,813 and

---

[3] Although the trial court acknowledged it did not have to address the issue of damages, it concluded that Vitec had presented sufficient evidence that it had, and would actually lose, future sales of CST's. The amount of damages awarded was contrary to law because Vitec had presented evidence only of expected gross profits, and net profits is the correct measure. But, the court noted, a verdict that is "'against law'" is a ground for a new trial, not a JNOV.

11

costs of $92,121 for a total award of $1,178,934.  A second amended judgment (the second amended judgment) confirmed the judgment in favor of Defendants and incorporated the award of attorney fees and costs.

## VII.  Appeals

Vitec appealed from the amended judgment.  Defendants filed a protective cross-appeal from the original judgment.  Those two appeals were docketed as case No. G058388.

Vitec appealed from the order granting the motion for attorney fees, and Defendants filed a cross-appeal from the same order to challenge amount of fees awarded.  Those appeals were docketed as case No. G058864.  Defendants appealed from the order denying them attorney fees under the UTSA (Defendants have not briefed this appeal).  That appeal was docketed as case No. G058923.  In addition, Defendants "in an abundance of caution" appealed from the second amended judgment "to the extent that judgment incorporates certain orders denying in part Defendants' motion for attorneys' fees."  That appeal was docketed as case No. G059123.

We granted the parties' stipulated motions to consolidate the appeals and ordered Case Nos. G058388, G058864, G058923, and G059123 to be consolidated for all purposes.

## DISCUSSION

### I.  The Trial Court Did Not Err by Granting Summary Adjudication of Vitec's Breach of Contract Causes of Action and Punitive Damages Claim

Vitec contends the trial court erred by granting summary adjudication of its breach of contract causes of action and claim for punitive damages.  We review de novo an order granting summary adjudication.  (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 273.)  Summary adjudication is warranted if the moving papers establish no triable issue of material fact exists as to the claim being adjudicated.  (*Ibid.*)

12

Vitec's breach of contract causes of action alleged that Veris and Schneider breached the Confidentiality Provision and Nonutilization Provision of the 2006 NDA, the confidentiality provisions of the 2014 NDA and the Supply Agreement, and the exclusive arrangement provision of the Supply Agreement.

A. *Confidentiality Provision of the NDA*

It was undisputed that the Confidentiality Provision of the 2006 NDA commenced in May 2006 and expired two years later, in May 2008. It was also undisputed, and Veris conceded, that no confidential documents or proprietary information were transferred from Vitec to Veris until at least July 2009.

Although the NDA's Confidentiality Provision expired in May 2008, Vitec contends the 2006 NDA was orally modified to renew the Confidentiality Provision. The 2006 NDA states it can be amended "only by a signed writing." Vitec has never produced a signed writing amending the 2006 NDA.

Under Oregon law, which governs the 2006 NDA, parties may orally modify a written contract even if the writing contains an express provision against unwritten modifications. (*Bennett v. Farmers Ins. Co.* (2001) 332 Or. 138, 147, fn. 7 [26 P.3d 785, 792, fn. 7]; *Anderson v. Divito* (1995) 138 Or.App. 272, 282 [908 P.2d 315, 322]; *Barinaga v. JP Morgan Chase & Co.* (D. Or. 2010) 749 F.Supp.2d 1164, 1173.) To be binding, the oral modification of a written contract must be supported by consideration and proven by clear and convincing evidence. (*Miller v. Coldwell Banker W. Real Estate* (2001) 172 Or.App. 494, 500 [19 P.3d 948, 951]; *Anderson v. Divito, supra*, at pp. 281-282 [908 P.2d at p. 322]).

Vitec did not present clear and convincing evidence of an oral modification or renewal of the NDA's Confidentiality Provision. In the appellant's opening brief, Vitec cites the following evidence as proving an oral modification: (1) an e-mail exchange and declaration regarding the 2014 NDA, which Veris did not sign;

13

(2) deposition testimony by Marc Bowman of Veris[4] that he had not seen a communication from Veris denying the existence of a nondisclosure agreement; (3) deposition testimony by Bowman that Veris would not disclose a supplier's confidential information and that Vitec's parts drawings should not be shared with unauthorized parties; (4) deposition testimony that after August 2014, Veris purchased parts from Vitec at the prices set forth in the Supply Agreement; (5) the e-mail exchange from June 2012 (described in part III of the Facts section) that culminated in Rogers forwarding the 2006 NDA to Schneider and Schneider informing Veris the 2006 NDA had expired; (6) deposition testimony by Vitec's Martin Cook that he was "unhappy" about the sharing of Vitec parts drawings; (7) a declaration from Rogers that the NDA's confidentiality provision was "renewed and confirmed both verbally and in writing"; and (8) 38 pages of the record cited without explanation or context.

None of this evidence shows an oral modification. None of the communications even mentions renewal of the NDA's Confidentiality Provision. Further, once Schneider received the 2006 NDA, Schneider informed Veris that the NDA's Confidentiality Provision had expired. We decline to consider the 38 pages of the record cited without explanation or context because it is not our job to go through the record to find the precise evidence relied upon by Vitec. (See *Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.* (2010) 188 Cal.App.4th 401, 424.)

Rogers's declaration testimony that the Confidentiality Provision was renewed and confirmed was an inadmissible legal conclusion. Rogers's subjective belief that the Confidentiality Provision was still enforceable did not make it so: "'Agreement consists of mutual expressions; it does not consist of harmonious intentions or states of

---

[4] Vitec provides no record citations to support its claim that Bowman was Veris's vice-president of engineering. Bowman testified he was employed by Veris and "had positions that were engineering, development-related, running R & D groups, marketing, and running business groups."

mind.'" (*State v. Heisser* (2011) 350 Or. 12, 25 [249 P.3d 113, 120]; see *Kabil Developments Corp. v. Mignot* (1977) 279 Or. 151, 157-158 [566 P.2d 505, 508-509] [manifested assent, not subjective intents, determines whether a contract has been formed]; accord, *Vallejo Police Officers Assn. v. City of Vallejo* (2017) 15 Cal.App.5th 601, 617.) In his deposition, Rogers testified he could not recall whether the Confidentiality Provision of the 2006 NDA had been renewed. Rogers's deposition testimony controls over his inconsistent declaration. (*Shin v. Ahn* (2007) 42 Cal.4th 482, 500, fn. 12 ["a party cannot create an issue of fact by a declaration which contradicts his prior discovery responses"]; *Jacobs v. Fire Ins. Exchange* (1995) 36 Cal.App.4th 1258, 1270 ["A court may disregard a declaration, prepared for purposes of a summary judgment motion, which conflicts with deposition testimony of the declarant"].)

In his declaration, Rogers based his conclusion that the Confidentiality Provision had been renewed on two events. First, Rogers cited to the e-mail exchange from August 2015 (described in part IV of the Facts section) which culminated in the August 19, 2015 e-mail from Alder stating, "[t]he teams agree that although the product specifications are developed by Veris, the part drawings that you have created and marked confidential should not be shared with unauthorized parties." Veris's statement that Vitec's parts drawings should not be "shared" with unauthorized parties was not and could not be reasonably construed as an agreement by Veris and Schneider to renew wholesale the Confidentiality Provision. In Alder's e-mail, no mention was made of the 2006 NDA or its Confidentiality Provision. In addition, Vitec cites nothing in the record to support its assertion that Alder was a managing agent of Veris or Schneider and therefore capable of binding either one to an oral agreement.

Second, Rogers pointed to the fact that in August 2012 he sent a copy of the 2006 NDA to Schneider and "communicated Vitec's belief that the [C]onfidentiality [P]rovision was still enforceable." Because Schneider did not respond, Rogers claims there was "an understanding with Veris/Schneider." Schneider's failure to respond to

15

Rogers's e-mail was not evidence, much less clear and convincing evidence, that Schneider had agreed to an oral amendment or renewal of the NDA's Confidentiality Provision.  (See *Northwestern Agencies, Inc. v. Flynn* (1931) 138 Or. 101, 108 [5 P.2d 530, 532] ["'Silence does not amount to assent'"]; accord, *Southern Cal. Acoustics Co. v. C.V. Holder, Inc.* (1969) 71 Cal.2d 719, 722 ["Silence in the face of an offer is not an acceptance, unless there is a relationship between the parties or a previous course of dealing pursuant to which silence would be understood as acceptance"].)  Likewise, Bowman's testimony that he had not seen a communication from Veris denying the existence of a nondisclosure agreement is not competent evidence of an oral agreement.

Vitec argues the evidence established that Veris and Schneider were estopped from denying the existence of a renewal of the Confidentiality Provision of the 2006 NDA.  Under Oregon law, promissory estoppel may refer to "actions taken in reliance on a definite promise may serve as a substitute for consideration" or to the situation in which "a party acts in reliance on an indefinite promise to create a binding obligation."  (*Staley v. Taylor* (2000) 165 Or.App. 256, 261, fn. 5 [994 P.2d 530, 532, fn. 5].)  In the first case, contractual remedies are permitted; in the second case, only reliance damages are allowed.  (*Ibid.*)  Here, the trial court correctly found that Vitec failed to produce evidence that Veris (or Schneider) made any sort of promise or affirmative statement that could be construed as a promise to abide by and operate under the NDA's Confidentiality Provision after it had expired.

B.  *The 2014 NDA*

The 2014 NDA was signed by neither Vitec nor Veris.  "The general rule is that a contract is not binding until both parties sign it."  (*City of Big Bear Lake v. Cohen* (2017) 12 Cal.App.5th 922, 931; see *Ellis v. Mihelis* (1963) 60 Cal.2d 206, 213-214 ["when the parties contemplate that an agreement will be executed by the signing of all parties and will become effective only after such signature, the contract will not be binding until the parties have signed"].)

16

Vitec did not present evidence of an oral confidentiality agreement independent of the proposed written one. Vitec presented evidence that Janeth Valenzuela of Schneider sent an e-mail to Diane Curry, a customer service representative at Vitec, along with an unsigned copy of the 2014 NDA. Valenzuela requested that Vitec sign the 2014 NDA. Curry forwarded the e-mail to David Chang, Vitec's director of strategic account management, who forwarded it to Rogers and asked him to review and comment on it. Nobody ever signed the 2014 NDA. Vitec presented no evidence of negotiations or discussions leading to the 2014 NDA that might constitute an oral agreement.

Vitec relies on evidence it cited in support of its claim that the NDA's Confidentiality Provision was renewed or modified. But just as that evidence did not raise a triable issue as to whether the Confidentiality Provision was renewed or modified, that evidence, for the same reasons, does not raise a triable issue on whether there was an oral confidentiality agreement reflected by the terms of the 2014 NDA. The e-mail exchange from August 2015 (described in part IV of the Facts section), which culminated in the August 19, 2015 e-mail from Alder, cannot form the basis for the oral agreement because that exchange occurred over a year after the 2014 NDA was sent to Vitec.

In addition, any oral confidentiality agreement would have been barred by the statute of frauds. The Oregon statute of frauds provides that an agreement which by its terms is not to be performed within a year is void unless it is in writing and subscribed by the party to be charged. (Or. Rev. Stat., § 41.580(1)(a).) The California statute of frauds is the same. (Civ. Code, § 1624.) The 2014 NDA is subject to the statute of frauds because the 2006 NDA applies to all confidential information disclosed within three years of the effective date.

Vitec argues Veris and Schneider are estopped from asserting the statute of frauds. "'Where one has acted to his detriment solely in reliance on an oral agreement, an estoppel may be raised to defeat the defense of the Statute of Frauds.'" (*Stevens v.*

17

*Good Samaritan Hospital & Medical Center* (1977) 264 Or. 200, 204 [504 P.2d 749, 750].)  Vitec does not cite to any evidence of its reliance on an oral confidentiality agreement, and the record does not support the existence of an oral agreement.  Vitec argues that in reliance "on the contract" it "continued to provide Veris/Schneider with access to its part drawings, as well as the parties' performance to the Agreements."  Vitec's record citations do not support this proposition.

Vitec argues the 2014 NDA is excepted from the statute of frauds because Vitec and Veris are merchants under the Uniform Commercial Code.[5]  Article 2 of the Uniform Commercial Code, codified in Oregon Revised Statutes Chapter 72, only governs the sale of goods.  (Or. Rev. Stat., § 72.1020; *Meister v. Arden-Mayfair, Inc.* (1976) 276 Or. 517, 521 [555 P.2d 923, 925].)  The 2014 NDA did not involve the sale of goods.  The Oregon Commercial Code therefore does not apply to it.

C.  *The Supply Agreement*

The Supply Agreement was signed by Vitec but not by Veris.  Vitec sent the Supply Agreement by e-mail to Ernie Laitinen of Schneider.  (Vitec has never identified Laitinen's position or title at Schneider.)  Laitinen responded by e-mail dated August 27, 2014 that he could not sign a sole-sourcing agreement "unless there is a consensus at Schneider Electric and more than just a someday we'll work on something."  Chang understood Laitinen's response as a rejection of the Supply Agreement.

---

[5]  Under the Oregon's Uniform Commercial Code, a contract for the sale of goods for the price of $500 or more is not enforceable "unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by the authorized agent or broker of the party."  (Or. Rev. Stat., § 72.2010(1).)  There is an exception for contracts between merchants: "[I]f within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) of this section against such party unless written notice of objection to its contents is given within 10 days after it is received."  (*Id*., § 72.2010(2).)

Vitec argues a signed agreement was unnecessary because "Veris/Schneider did not meaningfully object to the terms of the Supply Agreement" after receiving it. Failure to object to a written confirmation of a contract between merchants may satisfy the Uniform Commercial Code statute of frauds. (Or. Rev. Stat., § 72.2010(2).)[6] But Schneider objected to the Supply Agreement by declining to sign it. On receiving the Supply Agreement, Laitinen told Vitec he could not sign the Supply Agreement without a consensus at Schneider, which he did not have. Chang at Vitec understood this response to be a rejection.

In addition, the evidence did not raise a triable issue of fact as to whether the Supply Agreement was a written confirmation of an agreed-upon contract. Rogers stated in a declaration that he sent the Supply Agreement to Schneider to confirm "the understanding" that Veris would purchase CST's exclusively from Vitec. This testimony is incompetent: Rogers does not divulge the basis for this understanding or how he came to know of it. (Evid. Code, § 702, subd. (a) [witness testimony is inadmissible unless witness has personal knowledge].)

Vitec also argues a signed Supply Agreement was unnecessary because Veris and Schneider "began operating as though the agreement was in full force and effect." Vitec identifies only one way in which this supposedly occurred: According to Vitec, Veris and Schneider "agreed to the price increase for Vitec's parts." In his August 27, 2014 e-mail, Laitinen stated, "[w]e have implemented the prices you showed." Acceptance of new prices does not constitute assent to the entire Supply Agreement, which had other provisions, including the exclusivity provision.

D. *Nonutilization Provision of the 2006 NDA*

Vitec alleged that Veris and Schneider breached the Nonutilization Provision of the 2006 NDA by disclosing the part drawings to PacTran in 2014 and 2015.

---

[6] Exclusivity agreements, sometimes called requirements contracts, are governed by the Uniform Commercial Code. (Or. Rev. Stat., § 72.3060.)

Unlike the Confidentiality Provision, the Nonutilization Provision does not expire. The Nonutilization Provision reads, in part: "Neither party shall utilize any part of the Proprietary Information *provided by the other party pursuant to this Agreement* except for exploration of the business relationship for which this Agreement was executed." (Italics added.) The italicized language is an important limitation. The Nonutilization Provision does not extend to all propriety information provided by Vitec to Veris, but extends only to proprietary information provided *pursuant to* the 2006 NDA.

As the trial court found, Vitec presented no evidence that the part drawings were provided to Veris *pursuant to* the 2006 NDA. The 2006 NDA was not a contract for the sale of goods, nor was it the agreement by which Vitec agreed to design and make the CST's for Veris. Rather, the purpose of the 2006 NDA was to "assure mutual confidentiality with respect to . . . Propriety Information" while Veris and Vitec "explore a business relationship." The part drawings were not prepared until 2009, after that business relationship had been created and after the Confidentiality Provision had expired.

E.  *Punitive Damages*

Vitec sought punitive damages for misappropriation of trade secrets. Punitive damages may be awarded in a trade secrets case only "[i]f willful and malicious misappropriation exists." (Civ. Code, § 3426.3, subd. (c).) Here, the trial court found that Vitec had not shown a triable issue of fact regarding whether any misappropriation was oppressive, fraudulent, or malicious and that there was "no evidence" of oppression, fraud, or malice.

Vitec does not dispute those findings. Instead, Vitec challenges summary adjudication of its punitive damages claim solely on the ground there was evidence that the Veris/Schneider employees who misappropriated the part drawings were officers, directors, or managing agents, or, if not, their actions were authorized or ratified by officers, directors, or managing agents of Veris/Schneider. Vitec therefore has forfeited

any challenge to the trial court's finding (*Billesbach v. Specialized Loan Servicing LLC* (2021) 63 Cal.App.5th 830, 846, fn. 9; *Browne v. County of Tehama* (2013) 213 Cal.App.4th 704, 716, 725-726.)  Even if the trial court erred by summarily adjudicating Vitec's claim for punitive damages, the error was harmless because Vitec failed at trial to prove misappropriation of a trade secret.

## II.  The Trial Court Did Not Err by Denying Vitec's Motions to Continue the Trial Date, Reopen Discovery, and for Leave to Amend Its Complaint and Trade Secret Identification

### A.  *Standard of Review*

Vitec argues the trial court erred by denying its requests to continue the trial date, to reopen discovery, and for leave to amend its complaint and trade secret identification.  The orders denying those requests are reviewed under the abuse of discretion standard.  (*Qaadir v. Figueroa* (2021) 67 Cal.App.5th 790, 814 [denial of motion for trial continuance]; *Foroudi v. The Aerospace Corp.* (2020) 57 Cal.App.5th 992, 1000 [denial of motion for leave to amend complaint]; *Cottini v. Enloe Medical Center* (2014) 226 Cal.App.4th 401, 418-419 [denial of motion to reopen discovery and continue trial]; *Hernandez v. Superior Court* (2004) 115 Cal.App.4th 1242, 1246 [denial of request to reopen discovery].)  It has been held that a demonstration of good cause is necessary for leave to amend a trade secret identification.  (*Neothermia Corp. v. Rubicor Medical, Inc.* (N.D. Cal. 2004) 345 F.Supp.2d 1042, 1045.)  "[A] trial court's finding of 'good cause' is generally reviewed deferentially, solely for abuse of discretion." (*Robinson v. U-Haul Co. of California* (2016) 4 Cal.App.5th 304, 327.)

### B.  *Background*

Vitec served a trade secret identification in October 2017, some 13 months after filing its complaint.  Vitec served its amended identification of trade secrets in February 2018.

Vitec's special interrogatory No. 28 asked Veris to "[d]escribe all information that [Veris] provided to [PacTran] regarding each PART." In a supplemental response dated September 10, 2018, Veris identified four part drawings. The response cautioned that, due to Veris's data retention policy, Veris might not have retained all of the documents responsive to Vitec's requests.

In December 2018, five days before the discovery service cutoff, Vitec served its first discovery requests on PacTran: a notice of deposition of PacTran's person most knowledgeable and request for production of documents. Vitec requested that PacTran produce, among other things, documents that PacTran had received from Veris regarding Vitec's parts.

PacTran served written responses in January 2019 and produced documents a few weeks later. Among the documents were some called "Product Review Analysis Details" for a branch circuit power monitor. (Vitec describes these documents as bills of materials and assembly instructions for two of Vitec's parts.) PacTran's document production prompted Vitec's counsel to search through Veris's document production to determine whether Veris had produced the Product Review Analysis Details. Counsel was not able to find those documents in the documents produced by Veris.

Trial was scheduled to begin on March 11, 2019. On February 14, 2019, Vitec brought an ex parte application for a trial continuance and an order shortening time on a motion to reopen discovery. Vitec alternatively sought an order shortening time on a motion for leave to amend its trade secret identification and for leave to amend its complaint.

As good cause for the relief sought, Vitec asserted: "Veris has made at least one false statement under penalty of perjury, and it has concealed material facts and documents. Specifically, Veris twice provided a sworn discovery response that the only information sent to [PacTran] regarding [Vitec]'s parts consisted of four of [Vitec]'s part drawings. [PacTran]'s document production and testimony bel[ie] Veris'[s] statement, as

[PacTran] stated that Veris also provided it with at least two of [Vitec]'s Bills of Materials ('BOM'), which provide a list of raw materials used in the construction of Vitec's parts, as well as a list of suppliers for those raw materials. Defendants openly acknowledge the commercially sensitive nature of such information." Vitec also argued that Veris had intentionally concealed the entire e-mail file of an employee (Bowman) and had lied in discovery responses by asserting that file had been lost.

The trial court granted the ex parte requests to shorten time on the motions to continue trial, reopen discovery, and amend the trade secret identification and complaint. The court set all three motions for hearing on February 28, 2019. Defendants opposed the motions.

The trial court (Judge McCormick) denied all three motions. The court noted that Vitec's request for leave to amend the complaint did not include a copy of the proposed amended complaint, which is required by rule 3.1324 of the California Rules of Court. In addition, Vitec had not complied with Code of Civil Procedure section 2024.050, subdivision (a), which requires a motion to reopen discovery to be accompanied by a "meet and confer" declaration.

The trial court found that Vitec had not demonstrated good cause for continuing the trial, reopening discovery, or amending its trade secret identification and complaint. The court found: "[Vitec] argues that the court should issue these orders because [Vitec] learned in January 2019 that Defendant [PacTran] possessed documents containing allegedly confidential information of [Vitec] and sent the documents to a third party. [Vitec] asserts that it did not know these facts until it received [PacTran]'s document production in January 2019. [¶] *[Vitec] did not know these facts from [PacTran] earlier because [Vitec] did not ask [PacTran].* [Vitec] sued [PacTran] on September 21, 2016. [Vitec] did not serve [PacTran] with written discovery until December 21, 2018—ten days before the discovery cutoff. [PacTran] responded to [Vitec]'s discovery promptly. [¶] [Vitec]'s claim that Defendant Veris . . . is somehow

responsible for [Vitec]'s failure to serve discovery on [PacTran] lacks merit. [Vitec] argues that a Veris discovery response was false because it allegedly did not inform [Vitec] that [PacTran] possessed all of the information [PacTran]'s document revealed. [Vitec] ignores that Veris also served a discovery response in September 2018 stating that documents responsive to [Vitec]'s document requests may no longer exist in Veris's files due to Veris's document retention policies. Upon receipt of the response, [Vitec] did not serve discovery on [PacTran]. [¶] Regarding the Bowman file, [Vitec] acknowledges it has known since at least September 2018 (Defendants state May 2018) that the Bowman file was missing. Raising the missing file on the eve of trial when [Vitec] has known of its status for months is not good cause for any of the orders [Vitec] seeks." (Italics added.)

The trial court also found prejudice: "The various orders [Vitec] seeks would also prejudice Defendants. This case has thus far accounted for 852 docket entries and numerous, at times weekly, hearings. The parties have filed at least fifteen ex parte applications, including five in the last three weeks. The case has involved extensive discovery and motion practice, undoubtedly at great expense for the parties. [Vitec] cannot upend the case and the trial schedule at this juncture based on a failure to propound time discovery to a party named in its original complaint filed two and a half years ago."

C. *Motion to Continue Trial*

California Rules of Court, rule 3.1332 (rule 3.1332), which governs motions for continuance of a trial, cautions: "To ensure the prompt disposition of civil cases, the dates assigned for a trial are firm. All parties and their counsel must regard the date set for trial as certain." (Rule 3.1332(a).) Trial continuances are "disfavored," and "[t]he court may grant a continuance only on an affirmative showing of good cause requiring the continuance." (Rule 3.1332(c).)

Rule 3.1332(c) identifies seven circumstances that may indicate good cause. (Rule 3.1332(c)(1)-(7).) Vitec cites two of these: (1) "A party's excused inability to obtain essential testimony, documents, or other material evidence despite diligent efforts" and (2) "A significant, unanticipated change in the status of the case as a result of which the case is not ready for trial." (Rule 3.1332(c)(6) & (7).)

The trial court found that Vitec had not demonstrated good cause in that its inability to obtain discovery was not excused and Vitec had not made diligent efforts. Any change in status of the case should have been anticipated because Vitec had failed to exercise diligence in obtaining discovery in a prompt and timely fashion. The court found that continuing the trial date would cause Defendants to suffer prejudice. (Rule 3.1332(d)(5) [prejudice to parties is a factor to be considered].) Vitec does not challenge the trial court's findings of lack of diligence and prejudice.

We review the trial court's finding of good cause deferentially and only for abuse of discretion. (*Robinson v. U-Haul Co. of California, supra*, 4 Cal.App.5th at p. 327.) The trial court's findings are reviewed under the substantial evidence standard. (*County of San Diego v. Gorham* (2010) 186 Cal.App.4th 1215, 1230 [under abuse of discretion standard, factual findings are reviewed for substantial evidence].) Trial continuances are disfavored, and the decision whether to grant continuance is highly discretionary with the trial court. Here, the trial court properly exercised that discretion by denying Vitec's motion to continue trial on the ground that Vitec had not exercised diligence in pursuing discovery.

D. *Motion to Reopen Discovery*

A party seeking to reopen discovery is required to file a noticed motion accompanied by a meet and confer declaration. (Code Civ. Proc., § 2024.050, subd. (a).) Vitec did not submit a meet and confer declaration or explain why it did not do so. Vitec's failure to comply with section 2024.050, subdivision (a) is in itself sufficient to uphold the order denying Vitec's motion to reopen discovery.

In exercising its discretion to grant or deny a motion to reopen discovery, the court may consider "[t]he diligence or lack of diligence" of the party seeking to reopen discovery and the likelihood that reopening discovery "will prevent the case from going to trial on the date set . . . or result in prejudice to any other party." (Code Civ. Proc., § 2024.050, subd. (b)(2) & (3).) Here, the trial court found that Vitec had not been diligent in pursuing discovery and reopening discovery would result in prejudice to Defendants. Vitec does not challenge those findings. It is not disputed that reopening discovery would have prevented the case from going to trial on the date set. The trial court's findings are supported by substantial evidence. (*County of San Diego v. Gorham, supra,* 186 Cal.App.4th at p. 1230.) The trial court did not abuse its discretion by denying Vitec's motion to reopen discovery.

E. *Motion for Leave to Amend Trade Secret Identification*

A trade secret identification may be amended only on a showing of good cause. (*Neothermia Corp. v. Rubicor Medical, Inc., supra*, 345 F.Supp.2d at p. 1045; see *Perlan Therapeutics, Inc. v. Superior Court* (2009) 178 Cal.App.4th 1333, 1350 ["If, through discovery, [plaintiff] uncovers information suggesting defendants misappropriated additional trade secrets, it may have good cause to amend its trade secret statement under appropriate circumstances"].)

Good cause includes, typically, a party's diligence, the excused inability to have sought the relief earlier, and lack of prejudice to the opposing party. (See, e.g., Code Civ. Proc., § 2024.050, subd. (b).) Here, the trial court found that Vitec did not demonstrate good cause because it had not exercised diligence in conducting the discovery from which it learned of the additional trade secrets. The court found that granting Vitec's motion to amend the trade secret identification would result in prejudice to Defendants and delay the trial. The trial court's findings are supported by substantial evidence. (*County of San Diego v. Gorham, supra*, 186 Cal.App.4th at p. 1230.) The

trial court did not abuse its discretion by denying Vitec's motion to amend the trade secret identification.

F. *Motion for Leave to File Amended Complaint*

A motion for leave to file an amended pleading must include a copy of the proposed amended pleadings. (Cal. Rules of Court, rule 3.1324(a)(1).) Vitec's motion for leave to file an amended complaint did not include a copy of the proposed amended complaint. Vitec's failure to comply with rule 3.1324 is sufficient in itself to uphold the order denying Vitec's motion for leave to amend. In addition, the trial court's findings of Vitec's lack of diligence and prejudice to Defendants justified denial of the motion. (*Melican v. Regents of the University of California* (2007) 151 Cal.App.4th 168, 175; *Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, 486-487.)

### III. The Trial Court Did Not Err by Granting Defendants' Motion for JNOV

A. *Relevant Law and Standard of Review*

The trial court granted Defendants' motion for JNOV on the ground substantial evidence did not support the jury's findings that the six part drawings serving as the basis for Vitec's misappropriation of trade secrets cause of action were trade secrets. "'A trial court may grant a motion for JNOV only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support it. [Citation.] The standard of review on appeal is the same as that in the trial court—whether any substantial evidence, contradicted or uncontradicted—supports the jury's conclusion.'" (*Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1017.) The reviewing court resolves all conflicts in the evidence and draws all reasonable inference in favor of the verdict. (*Carter v. CB Richard Ellis, Inc.* (2004) 122 Cal.App.4th 1313, 1320.)

"'Substantial evidence means such evidence as a reasonable fact trier might accept as adequate to support a conclusion; evidence which has ponderable legal

27

significance, which is reasonable in nature, credible and of solid value.'" (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1663.) Inferences drawn from the evidence must be the logical and reasonable product of the evidence and not speculation or conjecture. (*Frei v. Davey* (2004) 124 Cal.App.4th 1506, 1512.)

A prima facie claim of misappropriation of trade secrets has three elements: "(1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." (*Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1665, citing Civ. Code, § 3426.1.) "'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Civ. Code, § 3426.1, subd. (d).)

"[T]he focus of the inquiry regarding the independent economic value element is 'on whether the information is generally known to or readily ascertainable by business competitors or others to whom the information would have some economic value. [Citations.] Information that is readily ascertainable by a business competitor derives no independent value from not being generally known.'" (*Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 62 (*Altavion*).)

The information must be valuable enough to give its owner an economic advantage over others. (*Altavion, supra*, 226 Cal.App.4th at p. 62.) Some cases hold that the actual or potential advantage of the information "'"need not be great"'" (*ibid.*), while others hold that "the secrecy of this information provides a business with a 'substantial business advantage'" (*Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514, 1522). Under either standard, the actual or potential value of the information "must be '"more than trivial."'" (*Altavion, supra*, at p. 62.)

28

B. *The Trial Court's Findings*

The court concluded the evidence did not support a finding that the six part[] drawings were trade secrets: "At trial [Vitec] limited its trade secret claim to six part drawings. These drawings mostly contain specifications and measurements pertaining to the transformers, and, in contrast to the various materials introduced at trial, do <u>not</u> contain information as to *how* to manufacture these parts." The court found the part drawings had no independent economic value because the only allegedly proprietary information included in the drawings could be ascertained easily by looking at the CST's or taking measurements of them. The court explained: "Most of the information reflected on the Part Drawings is 'design inputs,' that is, design specifications provided to [Vitec] by Veris, and therefore not the property of [Vitec] in the first place. . . . [¶] . . . The only information the Part Drawings convey either (1) ultimately belongs to Veris, not [Vitec], or (2) is readily apparent to anyone who has the necessary measuring equipment, whether that be calipers or electrical testing tools."

The court found that, although the part drawings might save Vitec's competitors the time and effort of taking measurements and conducting tests, "the uncontroverted evidence shows that the time saved is de minimis, particularly when compared to the 18 months that [Vitec] argued would be saved by a competitor who possessed the drawings. Defendants' witnesses estimated the Part Drawings would save a competitor 15 minutes to two hours in an effort to reverse engineer the transformers."

C. *Substantial Evidence Did Not Support the Jury's Findings That the Part Drawings were Trade Secrets*

The six part drawings themselves reveal no secrets. As the trial court found, most of information reflected in the part drawings are design inputs, which belong to Veris. The part drawings portray specifications and measurements for the CST's and do not disclose any information on how to manufacture them.

The CST's are available for purchase, and, as the trial court found, the information on the part drawings is readily ascertainable by observation and measurement with the appropriate equipment. (See *Altavion, supra*, 226 Cal.App.4th at p. 62 ["'Information that is readily ascertainable by a business competitor derives no independent value from not being generally known'"].) Pedro Rodriguez, Vitec's senior design engineer, testified the electrical specifications on the part drawings were "parameters" for testing and could be measured by anybody having a part sample and the proper equipment.

In contrast to the part drawings, the manufacturing specifications, which were admitted into evidence as exhibit 198, provided instructions on how to build a replica of Vitec's CST's. But, as the trial court found, the manufacturing specifications were not among the trade secrets at issue.

In the appellant's opening brief, Vitec identifies three sources of evidence as sufficient to support the jury's findings that the part drawings are trade secrets. First, Vitec argues "the strongest evidence" that the part drawings had economic value was that "PacTran requested the drawings to assist it with developing its part and that Veris sent PacTran the part drawings to assist it in developing their part quicker." The evidence Vitec cites in support of that proposition is 47 pages of a deposition transcript. The transcript was submitted to the trial court in support of Vitec's ex parte application to continue trial. Vitec does not provide a record citation to show that the deposition transcript was used or received into evidence at trial. Further, it is not our job to wade through the transcript to find the precise testimony relied upon by Vitec. (See *Chicago Title Ins. Co. v. AMZ Ins. Services, Inc., supra*, 188 Cal.App.4th at p. 424.)

The other sources of evidence, Vitec argues, are the testimony of two witnesses—Bowman and Rodriguez. Bowman, a former Veris employee, who testified by videorecorded deposition played at trial, testified that the part drawings gave PacTran "a very good starting point" for designing a transformer and the benefit to PacTran of

30

having the drawings was they "would give them something much closer to" Veris's needs. Bowman testified he "would think" the part drawings "would help reduce" research and development time and that it would take about 18 months to develop a CST to replace those made by Vitec and cost $1 million to $1.5 million.

Rodriguez, who designed CST's for Vitec, testified at trial that the part drawings provided the electrical and mechanical dimensions of the part and made it "much quicker" to design a CST to Veris's specifications. In contrast, in his deposition, Rodriguez testified that so long as he had the design inputs from the customer, the part drawings would not reduce the amount of time necessary to design a CST. He testified in his deposition: "It's going to get the same time. The same time." This deposition testimony was read into the record at trial.

The trial court chose not to consider Rodriguez's trial testimony because it contradicted his deposition testimony. Vitec argues that by doing so the trial court improperly weighed the evidence. Not so. The trial court had discretion to disregard Rodriguez's trial testimony. "A party's testimony at trial may be disregarded [on a JNOV motion] if it contradicts the party's own unequivocal pretrial admissions." (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2021) ¶ 18:59, p. 18–15, citing *Mikilian v. City of Los Angeles* (1978) 79 Cal.App.3d 150, 162 [on motion for nonsuit, court may ignore trial testimony that was contrary to deposition testimony].) Rodriguez's trial testimony that the Part Drawings made it "much quicker" to design a CST to Veris's specifications directly contradicted his deposition testimony that with or without the part drawings "[t]he same time" would be necessary to design a CST.

Because the trial court properly declined to consider Rodriguez's trial testimony, and we decline to consider the 47 pages of deposition transcript cited in the appellant's opening brief, Vitec is left to rely on Bowman's testimony to support the jury verdict. However, Bowman's testimony that the part drawings were "a very good

31

starting point" and might reduce research and development time was inadequate to support the jury's findings that the part drawings were trade secrets. "[I]t is not true that evidence of 'some' helpfulness or usefulness, if credited, would compel a finding of independent economic value. . . . Merely stating that information was helpful or useful to another person in carrying out a specific activity, or that information of that type may save someone time, does not compel a factfinder to conclude that the particular information at issue was 'sufficiently valuable . . . to afford an . . . economic advantage over others.' [Citation.] The fact finder is entitled to expect evidence from which it can form some solid sense of *how* useful the information is, e.g., *how much* time, money, or labor it would save, or at least that these savings would be 'more than trivial.'" (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 564-565 (*Yield Dynamics*).)

Bowman's testimony did not "form some solid sense of *how* useful" the part drawings might be. (*Yield Dynamics, supra*, 154 Cal.App.4th at p. 564.) He did not provide any clue as to how much time, money, or labor the part drawings might save. His equivocal testimony that he "would think" the part drawings would reduce research and development time is not of "'ponderable legal significance . . . reasonable in nature, credible and of solid value.'" (*Boeken v. Philip Morris, Inc., supra*, 127 Cal.App.4th at p. 1663.) From Bowman's testimony, a logical and reasonable inference could not be drawn that the part drawings afforded an economic advantage. (See *Frei v. Davey, supra*, 124 Cal.App.4th at p. 1512.)

In contrast to Bowman's imprecise and equivocal testimony, another Vitec witness, Amir Khalaji testified precisely and unequivocally to the amount of time that would be saved by having the part drawings. Khalaji is a design engineer and procurement manager at PacTran. Called as a witness by Vitec, he testified the part drawings would help PacTran build a part because "instead of measuring one-by-one all of these dimensions, we had them all in one spec sheet." When asked how much time

would be needed to take the measurements without the part drawings, he answered, "10, 15 minutes." Considering Bowman's testimony that it would take about 18 months to develop a CST to replace the one made by Vitec, time savings of 10 to 15 minutes would be trivial. (*Yield Dynamics, supra,* 154 Cal.App.4th at p. 564.) Khalaji's testimony, by confirming that information in the part drawings was not sufficiently valuable to afford an economic advantage, supports upholding the JNOV.

Our decision to affirm the amended judgment on the ground the evidence did not support the jury's findings that the part drawings were trade secrets means we need not address the Defendants' contention that the trial court should have granted the JNOV motion on the ground that Vitec had failed to prove damages. Our affirmance of the amended judgment also means we need not address Defendants' protective cross-appeal.

## IV. Attorney Fees: The Trial Court Erred by Using Hourly Rates Prevailing in Oregon

A. *Summary*

The trial court concluded that Defendants could recover attorney fees pursuant to the fee provision of the 2006 NDA and awarded them fees in the amount of $1,086,813 out of over $2.4 million requested. None of the parties likes this result. Vitec argues the trial court should have awarded no fees or minimal fees; Defendants argue the trial court should have awarded them a greater amount of fees. We disagree with Vitec's arguments. We agree with Defendants that the trial court erred by using prevailing hourly rates in Multnomah County, Oregon to calculate fees.

B. *Oregon Law Governs Substance; California Law Governs Procedure*

Before addressing the parties' arguments, we need to determine which state's law applies to recovery of attorney fees in this case. The NDA's choice of law provision states: "This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Oregon, excluding principles of conflict of law."

33

None of the parties argues the choice of law provision is unenforceable. (See *Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459 [enforceability of choice of law provision analysis].)  "It would be reasonable for the parties to expect their choice of law to govern the issue of attorney's fee payment."  (*ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 839.)  Thus, the attorney fees provision of the 2006 NDA is "governed by and construed and enforced in accordance with" Oregon law.

However, while Oregon law governs substantive issues, such as entitlement to attorney fees, California law governs procedural issues, such as the mode of their recovery.  "It is well established that while the courts generally enforce the substantive rights created by the laws of other jurisdictions, the procedural matters are governed by the law of the forum [citations].  As defined in the case law, the terms 'practice' and 'procedure' include the mode of procedure by which a legal right is enforced as distinguished from the substantive law which gives or declares the right."  (*World Wide Imports, Inc. v. Bartel* (1983) 145 Cal.App.3d 1006, 1012; see *Sadberry v. Griffiths* (1961) 191 Cal.App.2d 610, 614 [the forum's law applies to evidentiary issues, including admissibility and evidentiary presumptions, despite choice of law provision].)  "It has been said that a procedural law defines or creates the mode of procedure by which a legal right is enforced, while substantive law gives and declares that right."  (*City of Huntington Beach v. Becerra* (2020) 44 Cal.App.5th 243, 268.)

C. *Vitec's Arguments*

1. *"Grossly Inflated" Fees*

Vitec argues that the $2.5 million fee request submitted by Defendants was so "grossly inflated" and some billing entries so "shocking" that the trial court should have denied the request for fees in its entirety.

Whether an inflated attorney fees request justifies denial of all fees is a substantive issue because that issue concerns the loss of the right to recover fees under certain conditions.  California law grants the trial court discretion to deny attorney fees

altogether if the fee request is grossly inflated. (See, e.g., *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 991 [grossly inflated attorney fees request justified denying fees altogether]; *Ellis v. Toshiba America Information Systems, Inc.* (2013) 218 Cal.App.4th 853, 884-885 [inflated fee request justified denial of fees]; *Meister v. Regents of University of California* (1998) 67 Cal.App.4th 437, 455 [inflated request for attorney fees incurred in litigating request for attorney fees; trial court was permitted to deny fee recovery altogether].)

Oregon law does not give the trial court the same discretion. Under Oregon law, "[i]n any action or suit in which a claim is made based on a contract that specifically provides that attorney fees and costs incurred to enforce the provisions of the contract shall be awarded to one of the parties, the party that prevails on the claim shall be entitled to reasonable attorney fees in addition to costs and disbursements." (Or. Rev. Stat., § 20.096(1).) A party who prevails on a claim based on a contract with an attorney fees provision is "entitled" to recover fees. (*Benchmark Northwest, Inc. v. Sambhi* (2004) 191 Or.App. 520, 523 [83 P.3d 348, 349] (*Benchmark*).) "The award is mandatory; the trial court has no discretion to deny it." (*Ibid.*) The trial court has discretion to determine "what amount is 'reasonable.'" (*Ibid.*)

Oregon law therefore did not give the trial court discretion to deny Defendants' request for attorney fees altogether. The court had discretion to reduce fees, and it exercised this discretion by imposing an overall 10 percent reduction of fees to account for block billing, after limiting recovery to fees incurred through summary adjudication of the breach of contract causes of action. (See *Makarios-Oregon, LLC v. Ross Dress-For-Less, Inc.* (2018) 293 Or.App. 732, 743 [430 P.3d 142, 150] (*Makarios*) [court has "broad range of discretion" to reduce fees for block billing].)

We note that even if California law did apply, Vitec has not demonstrated how the trial court abused its discretion. Defendants' motion for attorney fees requested a total of $2,438,155.34. That amount included attorney fees under the UTSA. In the

35

first attorney fees order, the trial court denied the motion for fees insofar as it was based on the UTSA. The court continued the motion to consider fees under the 2006 NDA. In the second attorney fees order, trial court concluded that attorney fees could be recovered under the 2006 NDA but that the maximum amount recoverable was $1,511,352—the amount claimed to have been incurred through the time of summary adjudication of the breach of contract causes of action. The court reduced the fees by applying an across-the-board 10 percent reduction to account for block billing. To the extent there was inflated billing, the trial court appropriately exercised its discretion by making that reduction.

### 2. *Compliance with Oregon Procedure*

Vitec argues that Defendants failed to comply with rule 68C(2)(a) of the Oregon Rules of Civil Procedure, which requires that, "[a] party seeking attorney fees shall allege the facts, statute, or rule that provides a basis for the award of fees in a pleading filed by that party." This is a rule of procedure because it "defines or creates the mode of procedure by which a legal right is enforced." (*City of Huntington Beach v. Becerra, supra,* 44 Cal.App.5th at p. 268.) As we have explained, California procedure governs this litigation.

### 3. *Due Process*

Vitec argues that Defendants had the burden of proving their entitlement to fees and they failed to satisfy that burden because their motion for attorney fees did not cite to Oregon law. The trial court violated Vitec's due process rights, Vitec argues, by continuing the motion and permitting Defendants to submit supplemental briefing. Vitec cites no authority in support of this argument. The argument is forfeited. (Cal. Rules of Court, rule 8.204(a)(1)(B); see *Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 418-419.)

Vitec also did not cite any authority to the trial court in support of the due process argument. The court stated in the second attorney fees order: "[Vitec] cites no

36

authority for this proposition, and with good reason: [Vitec] will have the opportunity to respond to Defendants' supplemental brief at the hearing (and, by the time the hearing occurs, will have had two weeks to prepare such a response). A fee award will not violate [Vitec]'s due process rights."

4. *Apportionment*

Vitec argues the cause of action for breach of the 2006 NDA was "peripheral" to the cause of action for misappropriation of trade secrets and "[a] cursory review of [Defendants]' invoices demonstrates that very little time was spent related to the breach of contract related to the 2006 NDA." Vitec contends that "no more than $10,000 was billed related to the breach of the 2006 NDA." The trial court directly addressed that argument: "This argument ignores the rule that fees are not to be apportioned between recoverable and non-recoverable claims when issues are common to both. [Citation.] As explained in Defendants' original moving papers, the [] NDA claim is closely intertwined with the UTSA claim. The Court believes apportionment improper in these circumstances."

Under Oregon law, "[w]hen a party prevails in an action that encompasses both a claim for which attorney fees are authorized and a claim for which they are not, the trial court must apportion attorney fees, except when there are issues common to both claims." (*Bennett v. Baugh* (1999) 164 Or.App. 243, 247 [990 P.2d 917, 920].) Apportionment between claims is not required if the fee and non-fee claims involve common legal or factual issues, the theory being that "the party entitled to fees would have incurred roughly the same amount of fees irrespective of the additional claim or claims." (*Id.* at p. 248 [990 P.2d at p. 921]; see *C.A.M. Concepts, Inc. v. Gwyn* (2006) 206 Or.App. 122, 130 [136 P.3d 60, 63] [reversing trial court's decision to apportion fees because the non-fee claim involved the same factual and legal issues as the fee claims and there was accordingly no basis for reducing the award for time spent on the non-fee claim].)

Under Oregon law and California law, the trial court's decision regarding apportionment of attorney fees is reviewed under the abuse of discretion standard. (*Pulliam v. HNL Automotive Inc.* (2021) 60 Cal.App.5th 396, 407-408; *West Hills Dev. Co. v. Chartis Claims, Inc.* (2017) 284 Or.App. 133, 145 [391 P.3d 851, 858].)

In support of the motion for attorney fees, Defendants submitted a declaration and a spreadsheet which characterized each and every time entry as either related or unrelated to the 2006 NDA. Only fees incurred for time related to the 2006 NDA were sought. This evidence supports the trial court's decision not to apportion fees. Vitec does not address this evidence or attempt to show how the trial court erred by declining to apportion fees between the fee and nonfee causes of action.

Vitec also argues Schneider and PacTran were not entitled to recover attorney fees because they were not parties to the 2006 NDA. Under Oregon law, Schneider was entitled to recover fees even though it was not a party to the 2006 NDA. Oregon Revised Statutes, section 20.096(1) states: "In any action or suit in which a claim is made based on a contract that specifically provides that attorney fees and costs incurred to enforce the provisions of the contract shall be awarded to one of the parties, the party that prevails on the claim shall be entitled to reasonable attorney fees in addition to costs and disbursements, *without regard to whether the prevailing party is the party specified in the contract and without regard to whether the prevailing party is a party to the contract*." (Italics added.) Vitec sued Schneider for breach of the 2006 NDA. Schneider prevailed. Schneider could recover attorney fees.

As to PacTran, the trial court found: "While PacTran[] is not itself entitled to fees under the 2006 NDA (like Veris) or by operation of statute (like Schneider), the issues underlying the UTSA claim (which was brought against PacTran[]) and the 2006 NDA claim overlap so much that apportionment is improper. To the extent that [Vitec] might argue some fees incurred prior to the dismissal of the 2006 NDA claim are solely attributable to PacTran[]'[s] defense of the UTSA claim, the Court disagrees. The fees

38

were incurred in the defense of all claims on behalf of all Defendants." Vitec does not argue this finding is not supported by substantial evidence or explain how the court erred legally by declining to apportion fees incurred by PacTran.

Under Oregon law, the issue of apportionment of fees between parties can be resolved by addressing whether fees should be apportioned between fee claims and nonfee claims. (*Vill. at North Pointe Condos. Ass'n v. Bloedel Constr. Co.* (2016) 278 Or.App. 354, 369 [374 P.3d 978, 988-989] adhered to as modified on recon., 281 Or.App. 322 [383 P.3d 409].) Here, the trial court's decision not to apportion fees between the cause of action for breach of the 2006 NDA and the misappropriation of trade secrets cause of action also supports the decision not to apportion fees between Veris/Schneider and PacTran.

5. *Reasonableness of Fees, Billing Detail, and Block Billing*

Vitec argues the fees claimed were unreasonable, Defendants' billing statements lacked required detail, and Defendants' attorneys used block billing. Under both Oregon law and California law, a trial court has discretion to determine what is a reasonable amount of attorney fees. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096; *Benchmark, supra*, 191 Or.App. at p. 523 [83 P.3d at p. 349].) Vitec does not explain how or why the amount of fees awarded by the trial court was unreasonable. Nor does Vitec explain how the bills submitted by Defendants lack required detail.

Vitec's argument about block billing is puzzling. The trial court agreed with Vitec that "Defendants' bills are filled with block billing." The court cited Oregon law that block billing is "disfavored in Oregon and is difficult to reconcile with the obligation to provide *detailed* statements in support of fee requests." (*Makarios, supra*, 293 Or.App. at p. 743 [430 P.3d at p. 150].) The court compared the five percent reduction in attorney fees approved in *Makarios* to account for block billing against routine cuts of 50 percent in Oregon federal district courts and decided to apply a 10

39

percent across-the-board reduction to account for block billing. Vitec does not argue the court erred by applying a 10 percent reduction.

D. *Defendants' Appeal*

In their appeal, Defendants argue the trial court erred by awarding fees based on prevailing hourly rates in Multnomah County, Oregon rather than Orange County, California. According to Defendants, using Orange County rates would increase the attorney fees award from $1,085,813 to $1,360,216.80.

The trial court found: "Although this case was brought in Orange County, the 2006 NDA—which controls fee recovery—provides that the only proper venue for suit is Multnomah County, Oregon, i.e., Portland. . . . Thus, the relevant locality for fee purposes is Portland, not Orange County. Defendants, having sought fees under a contract that provides for exclusive venue in Portland, are entitled to recover Portland rates for legal services." The court used the Oregon State Bar Economic Survey, which provides mean and median rates by location, practice area, and experience, to set the hourly rate for the four attorneys who billed more than 300 hours representing Defendants in this litigation. The court concluded the "appropriate benchmark" was the seventy-fifth percentile rate for Portland, Oregon, attorneys. The result was a reduction of $303,782 from the amount of fees requested.

Section 20.075 of the Oregon Revised Statutes lists a series of factors a trial court must consider in determining the amount of an attorney fees award. One factor is "[t]he fee customarily charged in the locality for similar legal services." (Or. Rev. Stat., § 20.075(2)(c).) Under Oregon law, the locality may be the county where the case was tried or, if justified, the county where the attorneys have their offices. (See *Hanna Ltd. P'ship v. Windmill Inns of Am., Inc.* (2008) 223 Or.App. 151, 166 [194 P.3d 874, 882] [trial court did not err by using Portland, rather than the county where the case was tried, as the locality because the case required "specialized business litigators not readily available in the locality"].) "Although ORS 20.075(2)(c) requires a trial court to consider

40

'[t]he fee customarily charged in the locality for similar legal services,' it does not by its terms impose a ceiling on the fees that a court may award." (*Makarios, supra*, 293 Or.App. at p. 742 [430 P.3d at p. 149].)

California law is similar. Under California law, the starting point for determining an attorney fees award is calculation of the lodestar, which is "the basic fee for comparable legal services *in the community*." (*Ketchum v. Moses* (2001) 24 Ca1.4th 1122, 1132, italics added.) To set the reasonable hourly rate for use in the lodestar calculation, a court must determine and consider the rate prevailing for similar work "in the community where the court is located." (*Syers Properties III, Inc. v. Rankin* (2014) 226 Cal.App.4th 691, 700; see *Pasternak v. McCullough* (2021) 65 Cal.App.5th 1050, 1055; *In re Tobacco Cases I* (2013) 216 Cal.App.4th 570, 582; *Center for Biological Diversity v. County of San Bernardino* (2010) 188 Cal.App.4th 603, 616.)

Accordingly, under both Oregon and California law, the trial court in the present case should have considered the rates prevailing in Orange County, which is the locality or community where the case was tried, to determine the reasonable hourly rates for use in calculating a fee award.

The trial court interpreted the NDA's forum selection clause as permitting recovery of attorney fees based only on prevailing rates in Portland, Oregon. We construe the 2006 NDA independently as a matter of law. (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955.) We do not read the forum selection clause of the 2006 NDA, which does not mention attorney fees, as an agreement that attorney fees would be based on prevailing rates in Portland, Oregon. The forum selection clause of the 2006 NDA does not lend itself to such an interpretation.

The 2006 NDA states that each of the parties "consents to the jurisdiction of the courts of the State of Oregon, and agrees that such courts shall have personal jurisdiction over each of the parties hereto" and that "[v]enue for all disputes relating to

41

this Agreement shall be only in Multnomah County Circuit Court." This is a permissive, not mandatory, forum selection clause. (See, e.g., *Animal Film, LLC v. D.E.J. Productions, Inc.* (2011) 193 Cal.App.4th 466, 471-472 [forum selection clause stating that parties "submit and consent to the jurisdiction" of courts present in the state of Texas was permissive, not mandatory].) In other words, a litigant may, but is not required to, file litigation in Oregon. The requirement that venue be in Multnomah County Circuit Court only kicks in if a litigant files suit in Oregon or the case is transferred there. The inclusion in the 2006 NDA of a permissive forum selection clause means the parties contemplated that litigation might be filed outside of Oregon, in which case the litigants likely would retain non-Oregon lawyers charging hourly rates different from those prevailing in Multnomah County, Oregon.

Vitec chose to bring this lawsuit in Orange County and, after amending its complaint to add a claim for breach of the 2006 NDA, did not seek transfer to Oregon. Defendants answered the complaint and did not seek to dismiss or transfer the case based on the NDA's forum selection clause. The matter was litigated in Orange County by attorneys from Southern California. The 2006 NDA is governed by Oregon law, and, under Oregon law, the trial court must consider the fee "customarily charged" in the county where the matter was tried or, if justified, the county where the attorneys are located. (Or. Rev. Stat., § 20.075(2)(c); *Hanna Ltd. P'ship v. Windmill Inns of Am., Inc., supra*, 223 Or.App. at p. 166 [194 P.3d at p. 882].)

A reason for granting a trial court discretion in setting a fee award is that the """"experienced trial judge is the best judge of the value of professional services rendered in his [or her] court.""" (*Ketchum v. Moses, supra*, 24 Cal.4th at p. 1132.) An Orange County judge is not, however, the best judge of the value of professional services rendered in the Multnomah County, Oregon, Circuit Court. We conclude the trial court erred by setting hourly attorney fees rates based on prevailing rates in Oregon.

Defendants argue we should remand with directions to increase the attorney fees award to $1,360,216.80. This argument presupposes the hourly rates charged by Defendants' attorneys were in line with prevailing rates in Orange County for similar work. Instead, we shall direct the trial court to determine and consider the hourly rates customarily charged in Orange County "for similar legal services" (Or. Rev. Stat., § 20.075(2)(c)) and, in the exercise of its discretion, determine a reasonable amount of fees (*Benchmark, supra*, 191 Or.App. at p. 523 [83 P.3d at p. 349]).

## DISPOSITION

The second amended judgment is affirmed except for the part that awards attorney fees. The order granting Defendants' motion for attorney fees is reversed and the matter is remanded on a limited basis with directions to the trial court to determine and consider the hourly rates customarily charged in Orange County for similar legal services and, in the exercise of its discretion, determine a reasonable amount of fees to be awarded to Defendants. Defendants to recover costs incurred on appeal.


FYBEL, J.

WE CONCUR:


MOORE, ACTING P. J.


MARKS, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.